SAFEGUARD INSURANCE CO. et alia, Plaintiffs,

v.

ANGEL GUARDIAN HOME, Defendant.

CV–93–1805(CPS).

United States District Court, E.D. New York.

Oct. 28, 1996.

---

## MEMORANDUM AND ORDER

SIFTON, Chief Judge.

This is an action under an insurance policy for a declaratory judgment pursuant to 28 U.S.C. §§ 1332 and 2201. Plaintiffs Safeguard Insurance Company, American and Foreign Insurance Company, and Royal Insurance Company (together referred to as "Royal")[1] commenced this action to disclaim coverage of their insured, the Angel Guardian Home ("AGH"), for liability arising out of the case of *Thomas v. City of New York*, No. 92 CV 1316 (CPS), 1995 WL 519991 (the *Thomas* action).[2]

The parties cross-moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiffs asked for a declaration that defendant is not entitled to coverage because of its failure to give timely notice of the claim underlying the *Thomas* complaint. In the alternative, plaintiffs sought judgment declaring that the incidents in question amounted to one "occurrence" under the policy and that plaintiffs are not required to cover any award for punitive damages. Plaintiffs also sought dismissal of defendant's counterclaims for breach of contract and bad faith. Defendant cross-moved for judgment on these counterclaims, judgment in its favor on Royal's claims, and attorney fees incurred in defending this action.

Finding under New York law that the parties' claims could not be resolved as a matter of law, the Court denied all motions for summary judgment. By stipulation dated April 7, 1995, the parties agreed to submit the case to the Court for a bench trial based upon a stipulated evidentiary record and the briefs submitted in support of the cross-motions for summary judgment. Having reviewed the record, the Court makes findings of fact and conclusions of law as set forth below pursuant to Rule 52 of the Federal Rules of Civil Procedure. In sum, the Court finds that Royal is obligated to defend and indemnify AGH for losses resulting from the *Thomas* action; the exposure of the Thomas children to the conditions giving rise to injury constitutes one occurrence; Royal is not required to pay punitive damages arising out of the *Thomas* action; Royal has neither breached its contract with AGH nor acted in bad faith; and AGH is not entitled to attorney fees.

## BACKGROUND

Royal provided insurance to AGH from 1983 to 1989, at which time AGH changed carriers to Lloyds' of London. Throughout its period of coverage, Royal's policy provided that Royal would pay on behalf of AGH "all sums which [AGH] shall become legally obligated to pay as damages because of (A) bodily injury, or (B) property damage" subject to certain terms and conditions. The policy contained among others the following conditions:

(a) In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably

---

1. The individual plaintiffs are referred to collectively and treated as one entity by their attorney and, absent any indication to the contrary, will be so treated by the Court.

2. The *Thomas* action has been settled.

obtainable information with respect to the time, place and circumstances thereof and the names and addresses of the injured and of available witnesses shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.

(b) If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or other process received by him or his representative.

The policy defined "occurrence" to mean

an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

Royal provided coverage with a $2 million per occurrence and a $2 million annual aggregate between January 24, 1983, and January 24, 1986. The policy was renewed for one year under substantially the same terms and conditions; it was then renewed for another year but with the policy limits reduced to $500,000. Royal also provided $2 million in excess coverage through yearly policies between January 24, 1983, and January 24, 1986.

According to the complaint filed in the *Thomas* action, the City of New York ("the City") had contracted with AGH in 1983 to place the children of Yvonne Thomas in foster homes and to supervise them. Five of the children were placed in the home of Carole Webb, while others were placed in another home. The children who had been placed in the Webb home remained under AGH's care until 1989, when they were formally adopted by Webb. AGH had assisted in arranging the adoption, which occurred after AGH had changed insurance carriers.

On October 10, 1990, Ellen Sheps, a supervisor at AGH, received a telephone call from Yvonne Thomas regarding Tosca Dean, one of her children whom Webb had adopted. According to Sheps' log notes, Thomas "stated Tosca was alleging [sic] that the adoptive mother's boyfriend [Mr. Bull] has sexually abused her since the age of 9." Pl.Ex. 5. In response to these allegations, Sheps promptly contacted the appropriate city officials as well as Harold Warren, an attorney for AGH, who advised her to contact AGH's insurance carrier.

Sheps' log notes report a struggle between Thomas and Webb over the children, with AGH attempting to sort through the conflicting stories while working with the City to investigate the matter. By October 24, 1990, the Thomas children had been removed from the Webb home. The log notes reflect Thomas' dissatisfaction with AGH, since she blamed AGH for the situation and accused it of failing to serve her with adoption papers and failing to help her visit her children once they were removed from the Webb home.

According to Sheps' log notes, the Webb foster home was officially closed in July 1991. Closure had been delayed because of the pending investigation by the City's Child Welfare Administration. According to the *Thomas* complaint, Bull was convicted in February 1991 of assaulting two of the Thomas children.

On November 27, 1990, Estelle Moore, the Director of Human Resources at AGH, having been apprised of Warren's recommendation that the insurance carrier be informed of the situation, sent notice of the allegations of abuse to Christopher Waldorf, AGH's broker for its policy with Lloyd's of London. Pl.Ex. 6. Moore was responsible for personnel benefits at AGH and was also the liaison for AGH's other insurance needs. Her responsibilities included making reports of incidents when required.

After the children were removed from the Webb home, AGH had little or no contact with Yvonne Thomas until it received the *Thomas* complaint in April 1992. AGH promptly forwarded this complaint to Royal. The complaint stated that the five children placed with Webb had been abused throughout the entire time they resided there, see *Thomas* Complaint at ¶ 38, and that Thomas informed AGH of the abuse in September of 1990.[3] The complaint alleges that "when Tosca disclosed that she and her siblings had

---

**3.** Royal and AGH acknowledge that the actual date of contact was October 10, 1990.

been physically and sexually abused ... [Thomas] notified defendants City, Angel Guardian and Sheps immediately" and that at this point "defendants then had actual knowledge of the severity of both the physical and sexual abuse of the children." *Thomas* complaint at ¶ 53. The complaint charges AGH with, *inter alia,* improperly investigating the Webb home, acting with deliberate indifference to the safety of the children, failing to supervise the children in the home, failing to train its employees properly, acquiescing in the use of force against the children, breaching its contract with the City as a foster home provider, and failing to release the children from foster care when appropriate.

In May 1992, AGH received a reservation of rights letter from Robert Connelly, claims consultant at Royal. Pl.Ex. 9. The letter expressly reserved Royal's rights on the grounds that punitive damages are not insurable under New York law and the amount of damages demanded exceeded the policy limits. Royal maintains that this letter also set forth its position that the pattern of abuse constituted one occurrence under the policy. The letter, however, did not question the timeliness of AGH's notice to Royal. The letter was addressed to the attention of Moore at AGH but on its face sought to "inform our insureds, The Angel Guardian Home, Ellen Sheps and Jacqueline McKelvey" that Royal was reserving its rights with regard to punitive damages. Connelly requested that AGH deliver copies of the letter to the individuals mentioned.

In this letter, Connelly also explained that Royal had retained Anthony DeMarco as AGH's attorney in the *Thomas* action. He warranted that "Royal will not breach your attorney/client relationship by requesting any opinions of Attorney DeMarco concerning coverage or interests against his client." Although Connelly acknowledged that De-Marco would provide representation for both covered and non-covered matters, he recommended that the insureds retain separate counsel for non-covered matters and noted that Royal would not pay for such additional counsel.

On June 3, 1992, Connelly sent a letter to DeMarco detailing Royal's ideas for AGH's defense. The letter stated that "[a]s part of our complete claim service to your clients, we have a direct obligation to be directly involved as their liability insurance carrier." Def.Ex. M. In the letter, Connelly asked various questions about the extent of AGH's potential liability. For instance, he questioned whether or not AGH knew Bull was present in the Webb home, what role AGH had in the adoption process, when AGH was first informed of the abuse and what action was taken at that time. Connelly also sought "a complete duplicate of our insureds' records" and transcripts of relevant court records. The letter states that such information would assist Royal in formulating a defense for AGH. Connelly requested this information twice more, in June and July 1992. With the exception of the reservation of rights letter, Connelly's requests for information were directed to DeMarco. Connelly testified at his deposition that he never discussed coverage issues with DeMarco.

Connelly retired in July 1992. During his tenure as the claims consultant on AGH's case, he kept notes on the progress of the claim. These notes record his analysis of the complaint and document his ideas for investigating the *Thomas* allegations. Royal argues that selected phrases from these notes evidence Connelly's concern with the timeliness of notice upon his receipt of the complaint, but read in context, that inference is not compelling. At his deposition, Connelly testified that he had some concerns regarding notice because he felt the complaint was unclear as to whether AGH knew in October 1990 that the alleged abuse occurred during Royal's policy period. He admitted, however, that he never asked anyone at AGH about the information received at that time, although he was in occasional contact with Moore. Royal further notes Connelly's concern with obtaining the files, as evidenced by his letters to DeMarco; however, these letters only suggest his desire to facilitate and assist DeMarco's investigation of the claim and do not represent an effort to investigate coverage matters.

When Connelly retired in July 1992, Michael Collins took his place. Because Collins could not begin work on the claim until late August 1992, Robert Mooney, a manager of liability claims at Royal, monitored the case in the interim. Mooney retained coverage counsel in late July or early August of 1992, since Connelly had not done so. Mooney stated at his deposition that counsel was retained to explore questions concerning both the number of occurrences and the issue of late notice. On October 19, 1992, Mooney wrote to AGH stating that Royal was concerned about whether AGH had promptly notified Royal but that Mooney had insufficient information to draw a definite conclusion. Pl.Ex. 12. Mooney requested copies of the insurance policies [4] and case files and stated that Royal was reserving its right to disclaim coverage for untimely notice pending review of these materials. Mooney further stated that Royal had retained legal counsel to investigate the coverage issue. The letter also clearly set forth Royal's position that the alleged abuses constituted one occurrence, since it considered the event giving rise to liability to be the placement of the children with Webb rather than the individual incidents of abuse.

It is undisputed that Royal had no more factual information regarding the timeliness of notice of the claim when this second reservation of rights letter was sent than it had upon receipt of the complaint. This letter represents the first time the issue of notice was expressed to AGH in writing.

Certain records, including Sheps' log notes of her conversations with Thomas and her subsequent follow-up, were provided to Royal by DeMarco in December of 1992, after his "exhaustive review" of the "paper-laden case." Pl.Ex. 13. Although these documents ostensibly were provided to assist Royal in defending the *Thomas* action, DeMarco's letter accompanying them highlighted the circumstances under which AGH received word of the abuse in 1990. By letter dated December 28, 1992 to Warren, AGH's private counsel, Royal's coverage counsel stated that

Royal was evaluating the timely notice issue. Royal's formal disclaimer was presented at a meeting on February 16, 1993,[5] and was memorialized by Mooney in a letter dated March 4, 1993. Pl.Ex. 16.

This action for declaratory judgment was commenced in April 1993. Royal continued to defend AGH in the *Thomas* action pending resolution of this action, and the *Thomas* action has been settled in the meantime. By order dated September 14, 1995, the Court instructed the parties to brief issues not addressed in the original summary judgment motion papers.

## DISCUSSION

### Timeliness of AGH's Notice to Royal

■ Royal's central argument is that AGH should have given it notice of the "occurrence," that is, the alleged abuse, when informed in October 1990 that abuse had occurred during the period covered by the Royal policies, rather than waiting until service of the complaint. It is well established that compliance with a notice of occurrence provision in an insurance policy is a condition precedent to coverage of a claim. *Commercial Union Ins. Co. v. International Flavors & Fragrances, Inc.*, 822 F.2d 267, 271 (2d Cir.1987) ("*Commercial Union*") (applying New York State law). "The test for determining whether the notice provision has been triggered is whether the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim." *Id.* at 272. However, the insured may proffer a reasonable excuse or explanation for a delay in notification, such as lack of knowledge or a good faith belief in non-liability; in such a case, "the reasonableness of any delay and the sufficiency of the excuse offered is a matter for trial." *Avondale Indus., Inc. v. Travelers Indem. Co.*, 774 F.Supp. 1416, 1430 (S.D.N.Y.1991) (citation omitted).

■ AGH argues that it had a reasonable, good faith belief that it would not be held

---

4. Royal repeatedly states that it did not possess copies of its policies covering AGH.

5. The delay between December 1992 and the February 1993 meeting was to accommodate Warren.

liable for this claim, and thus notice to Royal was not required in 1990. As the New York State Court of Appeals has explained, .

> [w]hen the facts of an occurrence are such that an insured acting in good faith would not reasonably believe that liability on his part will result, notice of the occurrence given by the insured to the insurer is given "as soon as practicable" if given promptly after the insured receives notice that a claim against him will in fact be made.

*Merchants Mut. Ins. Co. v. Hoffman,* 56 N.Y.2d 799, 452 N.Y.S.2d 398, 399, 437 N.E.2d 1155, 1156 (1982). A reasonable belief in non-liability may stem from a belief in immunity from suit, but it may also be supported by a reasonable, good faith belief that a claim is unlikely:

> The cases excusing an insured's failure to notify an insurer of an occurrence based on a good faith belief of non-liability are supported by the rationale that if insureds were required to notify insurers of every incident that poses even a remote possibility of liability, insurers would soon be swamped with notice of minor incidents that pose little danger of resulting even in an action by the injured party against the insured, let alone a claim by the insured against the insurer.

*New York v. Blank,* 27 F.3d 783, 795 (2d Cir.1994); *see also Merchants Mut. Ins. Co.,* 452 N.Y.S.2d at 398, 437 N.E.2d at 1155; *Winstead v. Uniondale Union Free School Dist.,* 170 A.D.2d 500, 565 N.Y.S.2d 845, 848 (1991) (triviality of accident led insured to believe he would not be sued).

▪ An insured asserting this defense has a duty to make some inquiry when circumstances raise the possibility of liability; when inquiry leads to the reasonable conclusion that no liability will result or that no claim would be made, the insured may be excused from giving notice. *See White v. City of New York,* 81 N.Y.2d 955, 598 N.Y.S.2d 759, 615 N.E.2d 216 (1993); *Briggs v. Nationwide Mut. Ins. Co.,* 176 A.D.2d 1113, 575 N.Y.S.2d 413, 414 (1991). For example, in a case in which a bakery worker was injured by a mixing machine, the fact that the machine was repaired quickly and the seller of the machine was called to inspect the repairs provided the seller with a reasonable belief that it would not be held liable. *Greater New York Mut. Ins. Co. v. I. Kalfus Co.,* 45 A.D.2d 574, 360 N.Y.S.2d 28, 31 (1974), *aff'd,* 37 N.Y.2d 820, 376 N.Y.S.2d 923, 339 N.E.2d 621 (1975). In a case in which a dentist was accused of committing sexual abuse while administering treatment, the New York Court of Appeals held that, even though the incident formed the basis of a criminal conviction and disciplinary proceedings against him, notice to the insurer was not required until he was served with civil process because prior to that time he had no knowledge that an action would be brought. *Public Serv. Mut. Ins. Co. v. Goldfarb,* 53 N.Y.2d 392, 442 N.Y.S.2d 422, 425 N.E.2d 810 (1981) (finding that commencement of criminal or disciplinary proceedings did not constitute an "unusual occurrence" under the policy). In another case in which a foster child was injured while in the care of insured foster parents and brought suit several years later when he had reached majority, notice at the time of the accident was not required because the insureds promptly took care of the injury and the circumstances supported their reasonable belief that they would not be held liable. *Merchants Mut. Ins. Co. v. Hoffman,* 56 N.Y.2d 799, 452 N.Y.S.2d 398, 437 N.E.2d 1155 (1982). Because good faith belief in non-liability is a fact-specific inquiry, not surprisingly other cases have reached different results. *See, e.g., L'Italia Provisions Corp. v. Interboro Mut. Indem. Ins. Co.,* 86 A.D.2d 888, 447 N.Y.S.2d 335 (1982) (where employee's child was injured on plant floor and corporate vice-president was called to the scene and investigated the accident, notice was required at time of injury).

▪ Upon review of the stipulated evidence, the Court finds that AGH had a reasonable belief that it would not be sued or held liable for events occurring during Royal's policy period. Estelle Moore, who was charged with providing notice to insurers, was aware of the terms of the Royal policy, was aware that notice was to be provided within "a reasonable time," and was aware that notice was necessary upon "[t]he possible commencing of a lawsuit" and "if it was in our judgment that there was a potential

loss." Moore Dep. 8–10. Moore's understanding is in accord with the New York law, as discussed above. Moore testified that, when she discussed with Sheila Pelan, an administrator at AGH, the events relating to the Thomas children after they had been removed from the Webb home, they talked of the recent adoption of the Thomas children, in which AGH had participated, and which had occurred after AGH had switched insurance carriers. Although Sheps' log notes recount Thomas' anger towards AGH, that anger seems based on AGH's role in facilitating the adoption of her children by Webb and on AGH's inability to further her wishes precisely because the adoption had removed her parental rights. The notes reveal no foreshadowing of a lawsuit or of the theories of liability that would eventually be alleged in the *Thomas* action nor that AGH potentially would be held liable for anything other than participating in the adoption.

Other facts support a reasonable belief in AGH's non-liability. Log notes detail AGH's active efforts to remedy the situation and remove the children from the abusive environment with appropriate speed by working with the Child Welfare Administration. In addition, Sheps testified at her deposition that she, instead of the caseworker assigned to the Thomas children, was contacted because of her familiarity with the case and her amicable relationship with Ms. Thomas. From this evidence, it is clear that AGH had no idea that it would be held liable for events stretching back into Royal's policy period.[6]

Royal's argument that AGH could not have had a reasonable, good faith belief that it would not be sued since the allegations of abuse were serious enough to be considered a "critical incident" under the AGH policy requiring notice to city and state agencies, see Pelan Dep. at 26–28, is unpersuasive. The class of "critical incidents" also includes school suspensions, arrests, teenage pregnancies, and death of a child, foster parent or natural parent, none of which necessarily

requires notification to the insurer. Pl.Ex. 4 (AGH Critical Incidents Policies and Procedures).[7] Royal also attaches weight to AGH's attorney's contemporaneous recommendation that AGH contact its insurance carrier—AGH did not consider contacting Royal in 1990, though it did contact its current insurer (Lloyd's) pursuant to the attorney's advice. Moore Dep. 22–28. This fact also is not dispositive, since it does not address AGH's reasonable belief that the adoption would constitute the core of any potential liability.

Royal's argument that AGH knew no more upon receipt of the complaint than upon the 1990 telephone call is without merit. When the complaint was received, Pelan concluded that "in the summons allegations were made [about abuse] while the children were in care, [as] opposed to after they were adopted." Pelan Dep. at 23. Moore stated that "when the report was made to [Lloyd's] it was an incident, and now it was a lawsuit. . . . It was now a complaint and summons and it had reached a different form, I guess." What AGH now knew, which it did not know before, was that "a claim against [it] will in fact be made," *Merchants Mut.*, 56 N.Y.2d at 801, 452 N.Y.S.2d 398, 437 N.E.2d 1155.

Even were the Court to find that notice was late, the facts lead to the conclusion that Royal is precluded from disclaiming due to late notice because of the operation of New York State Insurance Law § 3420(d). Section 3420(d) provides:

> If under a liability policy delivered or issued for delivery in this state, an insurer shall disclaim liability or deny coverage for death or bodily injury arising out of a motor vehicle accident or any other type of accident occurring within this state, it shall give written notice as soon as is reasonably possible of such disclaimer . . . to the insured and the injured person or any other claimant.

As the New York State Court of Appeals has held,

---

6. In fact, Moore was aware of no other case in which an issue arose about which carrier should be notified about an allegation of child abuse. Moore Dep. 19.

7. The procedures do require certain city forms to be completed; significantly, the form for "accident, illness or death" calls for attorney and insurer notification, while the form for suspected abuse or maltreatment does not.

"[T]he question of unreasonableness," we said in *Allstate Ins. v. Gross,* [27 N.Y.2d 263] 317 N.Y.S.2d 309, 314, [265 N.E.2d 736, 739] [ ] "becomes a question of fact, or if *extreme, of law,* depending upon the circumstances of the case which make it reasonable for the insurer to take more or less time to make complete, and act diligently on its investigation of its coverage or breach of conditions in its policy."

*Hartford Ins. Co. v. Nassau County,* 46 N.Y.2d 1028, 416 N.Y.S.2d 539, 541, 389 N.E.2d 1061, 1063 (1979). An unexplained delay of fifteen months has been found unreasonable as a matter of law, as has an unjustified delay of as little as two months. *Id.* When the insured has delayed in providing notice to the insurer, the length of the insured's delay may be relevant. *Allstate Ins. Co. v. Gross,* 27 N.Y.2d 263, 317 N.Y.S.2d 309, 265 N.E.2d 736 (1970) (seven month delay of insurer unreasonable when insured delayed fifty-eight days in providing notice).[8]

■ In requiring an insurer to disclaim as soon as "reasonably" possible, the statute does not mandate that the insurer immediately disclaim, but instead allows it to investigate the underlying facts of the case. *Mount Vernon Fire Ins. Co. v. Orange Intercept, Ltd.,* CV 92–1986, 1992 WL 368085 *2 (E.D.N.Y. Nov. 19, 1992). However, save for the exceptional case, the reasonableness of that delay remains a question of fact. *Id.*

■ Here, the delay between Royal's receipt of the complaint and the commencement of its investigation is not excusable. Until its October 1992 reservation of rights, Royal conducted its investigation of this issue surreptitiously, if at all, through contacts with DeMarco, who was retained to represent AGH under the insurance policy and whose primary duties were to AGH. Royal repeatedly argues that the *Thomas* complaint provided insufficient information for it to draw a conclusion regarding late notice. While that complaint may be ambiguous, it is not so ambiguous as to mask completely the issue of notice. The *Thomas* complaint alleges that, when informed of the abuse initially, AGH and the other defendants were apprised of the "severity" of the abuse; in other paragraphs, the complaint makes clear that the duration of the abuse—one measure of severity—stretched back a number of years. Connelly testified that notice was an issue in his mind upon receipt of the complaint. Mooney's actions also show that this issue was apparent to Royal; he retained coverage counsel to investigate this issue shortly after Connelly retired. Nonetheless, he did nothing further to investigate the issue prior to issuing the second reservation of rights letter.

This record shows that while Royal was apprised of circumstances that would and did lead it to consider the timeliness of notice as an issue, it did little or nothing to resolve the issue. Both Connelly and Mooney were able to identify at their depositions the "key question" of timeliness—that is, whether AGH had notice that the abuse extended into its policy period—but both failed to take reasonable steps to determine the answer. Connelly Dep. at 122; Mooney Dep. at 38. Royal's concerns regarding this coverage issue were not investigated diligently or reasonably, as required by the statute. Thus, even if AGH were required to give notice to Royal upon receipt of the October 10, 1990 phone call from Yvonne Thomas, Section 3420(d) precludes the insurer from disclaiming coverage on this ground.[9]

8. Plaintiff relies on *Allstate Ins. Co. v. Frank,* 57 A.D.2d 950, 394 N.Y.S.2d 902, 904 (1977), for the proposition that an insurer's delay of eleven months was not unreasonable when the insured had delayed twenty-two months before providing notice. However, *Frank* was reversed by the New York Court of Appeals in a memorandum decision that relied on the authority of Gross. *See Allstate Ins. Co. v. Frank,* 44 N.Y.2d 897, 407 N.Y.S.2d 696, 379 N.E.2d 222 (1978).

9. AGH asserts that Royal violated § 3420(d) by failing to provide notice of disclaimer to Sheps, McKelvey, and the *Thomas* plaintiffs. AGH concedes that it does not have standing to challenge the failure of notice to the *Thomas* plaintiffs. With respect to Sheps and McKelvey, it is clear that Royal's letters to AGH were intended to provide notice to Sheps and McKelvey; indeed, one such letter requested that AGH provide their addresses in the event that AGH was unable to convey notice. These efforts were sufficient to provide notice to Sheps and McKelvey, who, after all, were only "insureds" by virtue of their employment with AGH.

## Coverage for Punitive Damages

 Royal argues, and AGH does not contest, that Royal's obligation to defend or indemnify AGH does not extend to any punitive damages that might be assessed. The New York State Court of Appeals has established that the public policy of the state "precludes indemnification for punitive damages." *Soto v. State Farm Ins. Co.*, 83 N.Y.2d 718, 613 N.Y.S.2d 352, 354, 635 N.E.2d 1222, 1224 (1994). The Court of Appeals noted that since punitive damages operate not to compensate the victim but to punish and deter the wrongdoer, it would be inconsistent with this goal to permit the insurer to bear the cost. *Soto*, 613 N.Y.S.2d at 355, 635 N.E.2d at 1225. Summary judgment for plaintiff is therefore appropriate on this ground.

## Number of Occurrences

Royal asserts that the incidents alleged in the *Thomas* complaint constitute one "occurrence" under its policies covering AGH and that its liability should be limited accordingly. Its position, as stated in Mooney's letter of October 19, 1992, is that the covered "event" was AGH's negligent placement of the children in inappropriate homes. AGH responds that the claims must be examined from the point of view of the victims, who allege several distinct acts of negligence. Furthermore, it argues that Royal issued three policies and that the occurrences should be considered separately under each policy.

In construing the language of an insurance contract, the court's primary obligation is to implement the intent of the parties. *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir.1986). With respect to the type of liability AGH would foreseeably face, such as that alleged in the *Thomas* action, the definition of "occurrence" is ambiguous. *See Society of Roman Catholic Church of Diocese of Lafayette & Lake Charles, Inc. v. Interstate Fire & Cas. Co.*, 26 F.3d 1359, 1364 (5th Cir.1994) ("*RCC*"); *Uniroyal, Inc. v. Home Ins. Co.*, 707 F.Supp. 1368, 1373 (E.D.N.Y.1988).

In *Uniroyal*, Judge Weinstein found language identical to that in the Royal policy to be ambiguous with respect to the injuries incurred from the spraying of Agent Orange in Vietnam. *Id.* at 1380–82. He held that "the terms of the definition of 'occurrence' are partly ambiguous: they identify a set of possible occurrences, but give little assistance in selecting the proper item from that set. More than one interpretation can reasonably be placed on the terms." *Id.* The parties' positions in this case make the ambiguity plain; Royal contends that the negligent placement of the children constitutes a single occurrence, while AGH contends that any negligent placement and failure to supervise must be viewed with respect to each individual plaintiff or each individual act of negligence. *See generally RCC,* 26 F.3d at 1373.

When interpreting the definition of "occurrence," New York courts have held it proper to look not at the individual injuries or claims but at the underlying cause of the injuries. *See id.; Champion Int'l Corp. v. Continental Cas. Co.*, 546 F.2d 502, 505–06 (2d Cir.1976), *cert. denied*, 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977); *Newmont Mines*, 784 F.2d at 135 (citing cases). In *Uniroyal*, Judge Weinstein found the "occurrence" to be the delivery of the herbicides to the military, which was a daily and ongoing process, and thus found one occurrence under the policy. *Uniroyal*, 707 F.Supp. at 1384–87. Courts have reached similar conclusions in products liability or environmental cases. *See Champion Int'l Corp. v. Liberty Mut. Ins. Co.*, 701 F.Supp. 409, 413, *amended by* 758 F.Supp. 127 (S.D.N.Y.1988) (separate consumer claims for peeling apart of plywood constitute one occurrence because of single cause of product defect); *Champion Int'l Corp. v. Continental Cas. Co.*, 546 F.2d 502 (delivery of defective vinyl to 1400 consumers via twenty-six distributors constitutes one occurrence).

In the case of *Michigan Chemical Corp. v. American Home Assur. Co.*, the Sixth Circuit Court of Appeals considered insurance coverage for the distribution and sale of contaminated livestock feed. That court declined to follow *Champion Int'l Corp.* because the Second Circuit had failed to consider the shipments to the twenty-six dis-

tributors as discrete occurrences, and thus it found that each shipment of contaminated feed to the distributors was a separate occurrence. 728 F.2d 374, 383 n. 10 (6th Cir. 1984). In *Uniroyal*, Judge Weinstein in turn distinguished *Michigan Chemical* because that court likely had little information about the pattern of shipments, whereas the shipments of Agent Orange he considered were "so numerous, uniform, routinized and regularized, at such steady and frequent intervals, that they merged into one continuous and repeated event." 707 F.Supp. at 1368.

 No New York case has considered the term "occurrence" with respect to liability for child abuse or molestation. The cases from other jurisdictions that the parties cite are inconclusive. In *Interstate Fire & Cas. Co. v. Archdiocese of Portland in Oregon*, the Ninth Circuit Court of Appeals found one occurrence per term of the liability policy when one individual had been sexually molested several times throughout the course of several policies. 35 F.3d 1325 (9th Cir. 1994).[10] Applying Louisiana law, the Fifth Circuit Court of Appeals found that when thirty-one children were molested by two priests, the cumulative injury to each child constituted a separate occurrence with respect to claims against the Church. *Society of Roman Catholic Church v. Interstate Fire & Cas. Co.*, 26 F.3d 1359, 1364 (5th Cir.1994); *see also Worcester Ins. v. Fells Acres Day Sch., Inc.*, 408 Mass. 393, 558 N.E.2d 958, 973–74 (1990) (numerous discrete acts of abuse by several different defendants at different locations comprise more than one occurrence). However, in *State Farm Fire & Casualty Co. v. Elizabeth N.*, a California court appears to have held that the abuse of several children in a home constituted one

occurrence with respect to a parent's negligence in allowing the abuse to continue. 9 Cal.App.4th 1232, 1236, 12 Cal.Rptr.2d 327 (1992).[11]

Reading the definition of occurrence into the coverage clause of the policy, as the court did in *Archdiocese of Portland*, the Royal policy must be interpreted to cover "damages because of bodily injury ... to which this insurance applies caused by ['an accident, including repeated or continuous exposure to conditions.']" Royal's contract further states that in consideration for the premium it would provide insurance "for the term of years specified" in an entry marked "Policy Period."

The cause of the bodily injury in this case is the "exposure to conditions" of sexual abuse. Each child suffering injury was exposed to such conditions in each policy period. The exposure is linked to the actions of AGH, which, as alleged in the *Thomas* complaint, were made with respect to the children as a group rather than individually. The complaint also alleges ongoing involvement by AGH directed toward maintaining the children in the Webb home and minimizing interaction with Ms. Thomas, an effort which eventually culminated in Webb's adoption of the children. Other than the complaint, there is no evidence in the stipulated record as to what role AGH played in continuing the "exposure" of the children to injurious conditions over the course of their residence at the Webb home. Based on the complaint and Sheps' log notes, which reveal at least some involvement by AGH in the adoption, the Court concludes that AGH participated in the "exposure" in each of the Royal policy periods. Thus, the number of occurrences equals the number of policy periods; apportionment of the loss among those

---

10. The Court examined a definition of occurrence substantially similar to the one at issue here, with the addition of the following sentence: "All such exposure to substantially the same general conditions existing at or emanating from one location shall be deemed one occurrence." *Id.* at *10.

11. The meaning of this holding is not entirely clear. Plaintiff cites it for the proposition that

multiple incidents of abuse to several children constitute one occurrence. The court's language is ambiguous as to whether it finds one occurrence overall or one occurrence per child. "[W]e conclude that the insured's liability to each child was one occurrence because each child's injuries resulted from repeated exposure to substantially the same general conditions." *Elizabeth N.*, 9 Cal.App.4th 1232, 12 Cal.Rptr.2d at 328.

periods is not an issue in this action.[12]

## Counterclaims for Breach of Contract and Bad Faith

Defendant points the Court to the following facts to support both its allegations of breach of contract and bad faith. First, of course, it points to the disclaimer itself. Second, it points to the untimeliness of the disclaimer, arguing that Royal breached the contract in not providing a timely disclaimer. Third, it points to Royal's actions in appointing and working with attorney DeMarco, in that Royal repeatedly sought and eventually obtained information regarding coverage issues from him, and further misinformed Royal of its right to choose independent counsel when a conflict exists between the insurer and the insured. Finally, it argues that Royal has failed to provide all of its insureds, i.e., the individual AGH employees sued in *Thomas*, with copies of the reservation of rights letters.

■ If Royal had disclaimed coverage and ceased to defend AGH in the underlying action, a breach of contract action might arise out of the disclaimer itself. However, Royal has continued to provide AGH with a defense in the *Thomas* action pending resolution of this declaratory judgment action, and thus Royal has not breached its obligations because it is still performing under the contract. AGH's claims of bad faith also fail.

With respect to punitive damages, it has been consistently held that plaintiffs may not recover such damages without submitting factual allegations that defendant, in its dealings with the general public, engaged in a fraudulent scheme which demonstrates "such wanton dishonesty as to imply a criminal indifference to civil obligations. Allegations of breach of an insurance contract, even a breach committed willfully and without justification are insufficient to authorize recovery of punitive damages."

*Fleming v. Allstate Ins. Co.,* 106 A.D.2d 426, 482 N.Y.S.2d 519, 520 (1984) (citations omitted), *aff'd* 66 N.Y.2d 838, 498 N.Y.S.2d 365, 489 N.E.2d 252 (1985), *cert. denied,* 475 U.S. 1096, 106 S.Ct. 1493, 89 L.Ed.2d 894 (1986); *accord Bleckner v. General Acc. Ins. Co. of Am.,* 713 F.Supp. 642, 649 (S.D.N.Y.1989).

Thus, "a party seeking to recover punitive damages must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally." *Rocanova v. Equitable Life Assurance Soc'y of U.S.,* 83 N.Y.2d 603, 612 N.Y.S.2d 339, 343, 634 N.E.2d 940, 944 (1994). Egregious tortious conduct is that in which "the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives." *Walker v. Sheldon,* 10 N.Y.2d 401, 223 N.Y.S.2d 488, 490, 179 N.E.2d 497, 498 (1961). In *Walker,* the court noted that punitive damages would not be available in ordinary cases of fraud and deceit, but instead "where the fraud, aimed at the public generally, is gross and involves high moral culpability." *Id.* 223 N.Y.S.2d at 491, 179 N.E.2d at 499.

■ While the wrongs of which AGH complains are serious, they do not reach the level of moral culpability or public injury necessary for an award of punitive damages. Two aspects of AGH's conduct are at issue. First, contrary to the law of this state, Royal recommended that AGH retain its own counsel with respect to non-covered matters, such as punitive damages, and asserted that such counsel would not be paid for by the insurer. In this state, however, when such a conflict exists, the insured is entitled to paid counsel of its choice to defend all covered and non-covered claims against it, because counsel chosen by the insurer might be predisposed to defend more vigorously those claims for which the insurer would be liable. *Goldfarb,* 53 N.Y.2d 392, 442 N.Y.S.2d 422, 427, 425 N.E.2d 810, 815 (1981). Second, throughout this action, Royal, citing Connelly's letters to DeMarco, has asserted that it repeatedly sought information relating to notice. More-

---

**12.** The argument that this interpretation would cause the number of "occurrences" to vary arbitrarily with the number of policy periods was rejected in *Archdiocese of Portland* because of the possibility that an "occurrence" could last beyond one year. As that court held, one three-year policy provides less coverage than three one-year policies, and insurers charge different rates accordingly.

over, despite AGH's private attorney's refusal to provide certain records, DeMarco provided Sheps' log notes and explicitly directed Royal to those sections relating to notice. These actions are directly contrary to Royal's own promise that it would not place DeMarco in a position of having to express his opinion on coverage and is contrary to its own letters to DeMarco which on their face request such information to aid in the investigation of the *Thomas* action rather than to examine coverage issues.

Despite this conduct, several factors preclude damages for bad faith. First, AGH has not shown that this conduct is directed against the public generally. It acknowledges this in its reply memorandum and requested additional discovery; however, its subsequent stipulation stated its intent to rely on its papers thus far. It has failed to present evidence to satisfy this prong of the bad faith requirement. Second, AGH has not sought to enforce its right to have independent counsel appointed in DeMarco's stead. While this does not excuse Royal's misrepresentation or misunderstanding of the law, acceptance of DeMarco by AGH is strong evidence that the harm caused by this conduct is not severe. Third, Royal has paid for its backhanded and surreptitious investigation of the notice issue because of this Court's finding that § 3240(d) precludes its untimely disclaimer on that ground. A prompt investigation by Connelly or Mooney would not have had that result.

Finally, because there was no breach of the insurance contract in this action, attorney fees incurred in this declaratory action will not be awarded. *See Great Northern Ins. Co. v. Dayco Corp.*, 637 F.Supp. 765, 787–88 (S.D.N.Y.1986).

Accordingly, the Court concludes that Royal is required to defend and indemnify AGH for covered liability incurred by AGH in the *Thomas* action and that the number of "occurrences" under the policies is equivalent to the number of policy periods during which actions by AGH led to the exposure of the *Thomas* children to abusive conditions. Royal is not required to cover punitive damages incurred by AGH. Attorney fees and damages for breach of contract and bad faith are not awarded to AGH.

The parties are directed to settle a judgment on notice in accordance with this opinion within thirty days of the date of this opinion.

The Clerk is directed to mail a copy of the within to all parties.

SO ORDERED.