

Villanova University School of Law Digital Repository

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-15-2007

# Hammersmith v. TIG Ins Co

Precedential or Non-Precedential: Precedential

Docket No. 05-3730

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Hammersmith v. TIG Ins Co" (2007). *2007 Decisions.* Paper 1385.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1385

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No.  05-3730

SCOTT HAMMERSMITH,
                    Appellant

v.

TIG INSURANCE COMPANY
(W.D. of PA. Civil Nos. 02-cv-01829 & 03-cv-01333)

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Nos. 02-cv-01829 & 03-cv-01333)
District Judge:  Honorable Gary L. Lancaster

Argued December 4, 2006
Before:  RENDELL and AMBRO, Circuit Judges,
         and BAYLSON,* District Judge.

_____

   *  Honorable Michael M. Baylson, Judge of the United
      States District Court for the Eastern District of
      Pennsylvania, sitting by designation.

(Filed: March 15, 2007)

Thomas E. Birsic
Paul K. Stockman     **[ARGUED]**
Kirpatrick and Lockhart
Nicholson Graham
535 Smithfield Street
Henry W. Oliver Building
Pittsburgh, PA  15222

James D. Belliveau
Michael H.  Rosenzweig
Edgar Snyder & Associates
600 Grant Street
10th Floor, U.S. Steel Tower
Pittsburgh,  PA  15219
   *Counsel for Appellant*
   *Scott Hammersmith*

Dennis J. Roman
Marshall, Dennehey, Warner,
Coleman & Goggin
600 Grant Street
2900 U.S. Steel Tower
Pittsburgh,  PA  15219

Peter G. Thompson     **[ARGUED]**
Thompson, Loss & Judge
1133 21st Street, N.W.
Two Lafayette Centre, Suite 450
Washington,  DC  20036
   *Counsel for Appellee*
   *TIG Insurance Co.*

Robert E. Dapper, Jr.
Dapper, Baldasare, Benson, Behling & Kane
444 Liberty Avenue
10th Floor, Four Gateway Center
Pittsburgh,  PA  15222
   *Counsel for Appellees*
   *AON Risk Services*
   *and AON Risk Services NY*

---

OPINION OF THE COURT

---

BAYLSON, *District Judge*.

   In this dispute over insurance coverage arising out of a tragic accident at the Pittsburgh International Airport, three issues are presented for decision following the District Court's grant of summary judgment to the excess insurer, Defendant-Appellee TIG Insurance Company ("TIG"):

   1.     Did the District Court err in holding that New York law governs this dispute as the state in which the insurance

contract was issued and delivered, applying the lex loci principle on choice of law?

2.      Did the District Court err in concluding as a matter of law that late notice to TIG prevented coverage?

3.      Did the District Court err in concluding as a matter of law that TIG disclaimed coverage within a reasonable period of time?

We write at some length on the choice of law issue because of confusing dictum in prior decisions of this Court. We conclude that although Pennsylvania's choice of law rules have abandoned the lex loci doctrine, the modern flexible "interest/contacts" choice of law doctrine requires application of New York law. On the issues of late notice and disclaimer, we conclude the District Court erred because a number of material facts prevent summary judgment from being granted in favor of the insurer.

## I.      **Introduction**

Understanding the issues in this case requires a brief excursion into the facts of the underlying accident and ensuing litigation. On February 21, 1998, Plaintiff-Appellant Scott Hammersmith ("Hammersmith"), an employee of Delta Airlines, was unloading bags at the Pittsburgh International Airport. As a result of the malfunctioning of the baggage handling equipment, he was severely injured and is now a quadriplegic requiring constant round-the-clock care. He instituted suit in the Court of Common Pleas of Allegheny

4

County by suing Delta Airlines and Allegheny County in August 1998. Allegheny County then brought into the suit the manufacturer of the equipment, CCC Conveyers, Inc. ("CCC"), which was a wholly owned subsidiary of the Dyson-Kissner-Moran Corporation ("DKM"). CCC and its parent, DKM, first became aware of Hammersmith's accident and lawsuit on October 16, 1998, when they received a copy of Allegheny County's writ of summons. However, neither the Complaint nor the Amended Complaint contained any specific damage allegations.

The record shows that DKM immediately forwarded these pleadings to its insurance broker, Aon, requesting that Aon notify DKM's insurer. DKM and its subsidiaries, including CCC, were covered by a multi-layer liability insurance program. The first $250,000 was self-insured, and the next $1,750,000 was covered under a primary policy issued by National Union Fire Insurance Company ("National Union"). Defendant-Appellee TIG then provided excess coverage for liability over $2,000,000, up to a $25,000,000 limit. After receiving DKM's request, Aon promptly notified National Union of the claim, but did not notify TIG.

Under DKM's excess insurance policy with TIG, the insured must notify TIG "as soon as practicable" of an occurrence which may result in a claim, or when a claim is made or a suit is brought. TIG. Ins. Co. No. XLB 271 23 83 § IV(F), App. 1211a. Furthermore, in the event of claim or suit, the policy requires the insured to "[i]mmediately send US copies of any demands, notices, summons or legal papers received in connection with the claim or SUIT." Id. Nonetheless, TIG was

5

not notified of the Hammersmith claim until October 30, 2000, almost two years after DKM originally learned of the suit, when a senior claims representative from AIG Vendor Services ("AIG"), the National Union affiliate handling DKM claims, sent TIG a letter.

There are a number of factual issues in the record, discussed below, as to how AIG's claims personnel and the attorneys handling the underlying case in the Allegheny Court of Common Pleas evaluated CCC's potential liability and the settlement value of the case during pretrial proceedings. However, it appears that just prior to a mediation scheduled for November 9, 2000, Hammersmith's demand for $23,000,000 came as a surprise to CCC's defense counsel. TIG was offered, but declined, the opportunity to participate in the mediation, which was unsuccessful.

Despite a great deal of back and forth between TIG and DKM on coverage issues in the ensuing months, TIG did not formally disclaim coverage until October 5, 2001, eleven months after it was originally notified of the Hammersmith claim.

At that point, National Union agreed to settle with Hammersmith for its unexpended policy limits, paid Hammersmith approximately $1,750,000, and assigned CCC's claim against TIG to Hammersmith with an agreement for a non-jury trial to determine his damages.

At the non-jury trial on November 28, 2001, Hammersmith's total damages were set at $25,700,000, of

6

which $19,300,000 was awarded against CCC, and subsequently increased for delay damages to $23,600,000, in which amount judgment was entered against CCC.

## II.    Proceedings in the District Court

Acting on his assignment of CCC's claims against TIG, Hammersmith filed suit against TIG in the District Court under diversity jurisdiction.  28 U.S.C. § 1332.  TIG brought in Aon as a third-party defendant.  Subsequently, Hammersmith also filed a separate suit in the District Court against Aon, alleging that Aon breached its duty to CCC by failing to give prompt notice to TIG.  The two separate cases were consolidated, and an Amended Complaint was then filed.  After discovery, TIG moved for summary judgment, based on allegedly late notice, and Hammersmith moved for partial summary judgment, asserting that TIG's delay in disclaiming coverage estopped TIG from avoiding liability.

The District Court granted summary judgment to TIG and denied Hammersmith's motion for partial summary judgment. The District Court's grant of summary judgment in favor of TIG did not resolve any of the issues concerning Aon,[1] and the Court

[1]The District Court specifically noted that plaintiff's claim against Aon "is not at issue here . . . and survives the Court's instant rulings."  App.10a.  Aon's appeal from the judgment of the District Court was quashed.  Although the parties' briefs in this Court discuss Aon's alleged acts and/or omissions in some detail, we will not consider these contentions since Aon is not a party to this appeal.

7

entered an Order under Rule 54, Fed. R. Civ. P., granting final judgment as to the issues between Hammersmith and TIG. This appeal follows.

On the choice of law issue, the District Court concluded that Pennsylvania's choice-of-law rules require that an insurance contract be governed by the laws of the state in which the contract was issued and delivered, which was New York.

As to the issue of late notice, the District Court held that, under New York law, an excess insurer is entitled to receive prompt notice and need not show prejudice from delay in receiving notice. The District Court concluded that, viewing the facts in the light most favorable to Hammersmith, TIG was not timely notified of the underlying accident and/or lawsuit, and thus DKM, the insured parent of CCC, was not entitled to coverage, absent some showing that TIG was estopped from disclaiming coverage based on its delay in doing so.

In denying Hammersmith's Motion for Partial Summary Judgment on the ground that TIG failed to disclaim coverage as soon as reasonably possible, the District Court held that TIG's investigation of the facts and disclaimer were reasonable as a matter of law.

## III.   Choice of Law

The parties disagree as to which state law applies in this case. Hammersmith urges Pennsylvania law, which requires an insurer to prove that the notice provision contained in the insurance contract was breached, and it suffered prejudice as a

8

result. <u>Brakeman v. Potomac Ins. Co.</u>, 371 A.2d 193 (Pa. 1977). TIG maintains that the District Court correctly applied New York law, which does not require an insurer to establish prejudice in order to disclaim coverage based on late notice. <u>Security Mut. Ins. Co. of N.Y. v. Acker-Fitzsimons Corp.</u>, 293 N.E.2d 76, 78 (N.Y. 1972). We exercise plenary review over the District Court's choice of law determination. <u>Berg Chilling Sys., Inc. v. Hull Corp.</u>, 435 F.3d 455, 462 (3d Cir. 2006).

Because this is a diversity case, we apply the choice-of law-rules of the forum state, Pennsylvania. <u>Klaxon v. Stentor Electric Mfg. Co.</u>, 313 U.S. 487 (1941). In this case, the District Judge erred in concluding it was "well-settled" that "[u]nder Pennsylvania choice of law rules, an insurance contract is governed by the law of the state in which the contract was made." App. 13a. Although both Pennsylvania and federal courts have dealt with this issue in a rather inconsistent fashion, we think it is now clear that Pennsylvania applies the more flexible, "interest/contacts" methodology to contract choice-of law questions.[2]

---

[2] Interestingly, neither party asked the District Court to consider or apply Texas law. TIG's principal place of business is in Irving, Texas. CCC is headquartered in Dallas. The record is silent as to where the conveyor belt was manufactured. Texas, like Pennsylvania, requires insurers to prove prejudice before they can disclaim coverage on late notice grounds. <u>See</u> <u>Hanson Prod. Co. v. Americas Ins. Co.</u>, 108 F.3d 627 (5th Cir. 1997). Because the parties only argued the choice-of-law issue with respect to New York and Pennsylvania, we will not consider Texas in our choice-of-law analysis.

9

**A.      Abandonment of Lex Locus Contractus in Pennsylvania**

**Choice-of-Law Jurisprudence**

Prior to 1964, Pennsylvania courts uniformly applied the law of the place of contract ("lex loci contractus") or injury ("lex loci delicti") in contract and tort actions, respectively.  In Griffith v. United Air Lines Inc., 203 A.2d 796 (Pa. 1964), the Pennsylvania Supreme Court expressly abandoned the "lexi loci delicti" rule "in favor of a more flexible rule which permits analysis of the policies and interests underlying the particular issue before the court." Id. at 805.  Under this new approach, Pennsylvania courts are to apply the law of the forum with the "most interest in the problem," rather than the law of the place of injury. Id. at 806.

In the wake of Griffith, it was unclear whether this new approach to tort choice-of-law questions would displace Pennsylvania's traditional "lex loci contractus" rule.[3]  Several

---

[3]Compare Neville Chemical Co. v. Union Carbide Corp., 422 F.2d 1205, 1210-11 (3d Cir. 1970) (citing Griffith in a breach of contract action for the proposition that the "Pennsylvania Supreme Court follows the modern approach and looks to the law of the place with the most significant relationship to the parties and transaction, on each issue, or the 'center of gravity' of the contract"), with Boase v. Lee Rubber & Tire Corp., 437 F.2d 527, 529-30 (3d Cir. 1970) ("In the six years since Griffith was decided, the Pennsylvania Supreme Court has not applied its rule in a contract case.").

10

years later, in <u>Melville v. American Home Assurance Co.</u>, 584 F.2d 1306 (3d Cir. 1978), we predicted that, when the occasion arises, "Pennsylvania [will] extend its <u>Griffith</u> conflicts methodology to contract actions." <u>Id.</u> at 1313. In reaching this conclusion, we examined several Pennsylvania conflicts decisions, including <u>In re Hunter</u>, 218 A.2d 764, 767 (Pa. 1966) (choosing Pennsylvania law to govern the validity of child-relinquishment forms because Pennsylvania had an "overriding and continuing interest" in the issue); <u>Crawford v. Manhattan Life Ins. Co. of N.Y.</u>, 221 A.2d 877, 881 (Pa. Super. Ct. 1966) (choosing West Virginia law to govern a life insurance policy because the contract was delivered there, but also observing the "result would be the same even if the standards enunciated in <u>Griffith</u> applied" because West Virginia had the "most significant relationship with and interest in the occurrence and the parties"); and <u>Gillan v. Gillan</u>, 345 A.2d 742, 744 (Pa. Super. Ct. 1975) ("[I]t would be error for us to apply the old, single reference rule that . . . the place where the contract became binding, or the place where it was to be performed, controls the choice of law.").

In the years following <u>Melville</u>, the Pennsylvania Superior Court, federal district courts, and this Court have continued to apply <u>Griffith</u>'s "interests/contacts" approach to contract choice-of-law questions. <u>See, e.g.</u>, <u>Am. Contract Bridge League v. Nationwide Mut. Fire Ins. Co.</u>, 752 F.2d 71 (3d Cir. 1985) (finding under <u>Griffith</u> that Pennsylvania law should govern an insurance policy even though the policy was negotiated, issued and delivered in Tennessee); <u>McCabe v. Prudential Prop. & Cas. Ins. Co.</u>, 514 A.2d 582 (Pa. Super. Ct. 1986) (applying <u>Griffith</u> in a case involving the interpretation of

11

an insurance contract); <u>Compagnie des Bauxites de Guinee v. Argonaut-Midwest Ins. Co.</u>, 880 F.2d 685 (3d Cir. 1989) (applying <u>Griffith</u> to determine if insured's notice to excess carrier was timely); <u>Gen. Star Nat'l Ins. Co. v. Liberty Mut. Ins. Co.</u>, 960 F.2d 377 (3d Cir. 1992) (performing a "significant contacts" analysis to determine which state's law should govern an insurance contract dispute); <u>Wilson v. Transport Ins. Co.</u>, 889 A.2d 563, 571 (Pa. Super. Ct. 2005) ("Under the flexible conflicts methodology approach to insurance contract cases, which was set forth by our Supreme Court in <u>Griffith</u>, the court must apply the law of the state having the most significant contacts or relationships with the contract and not the underlying tort.") (internal citations omitted) (quoting <u>Nationwide Mut. Ins. Co. v. West</u>, 807 A.2d 916, 921 (Pa. Super. Ct. 2002)).

The Pennsylvania Superior Court recently revisited the issue in <u>Budtel Associates v. Continental Casualty Co.</u>, 915 A.2d 640 (Pa. Super. Ct. 2006), and concluded "[a]fter careful reflection" that the "spirit and weight of this Commonwealth's precedents mandate we follow the <u>Griffith</u> rule in the contract law context." <u>Id.</u> at *3. Although the Pennsylvania Supreme Court has yet to apply <u>Griffith</u> to a contract dispute, "[t]o apply the <u>Crawford</u> rule would be to blindly adhere to [the] ... principle ... [that] the laws of the place where a contract is delivered control simply because the contract was delivered there." <u>Id.</u> Furthermore, the court noted, "the <u>Crawford</u> rule can be fairly subsumed by the more comprehensive <u>Griffith</u> rule because the <u>Crawford</u> rule examines a single contact (where the contract was delivered) while the <u>Griffith</u> rule ... examines all of the contacts that occurred within a contractual relationship." <u>Id.</u>

12

We agree with the Superior Court and expressly reaffirm our prediction in <u>Melville</u> that the Pennsylvania Supreme Court would apply <u>Griffith</u> to contract disputes. Although on several occasions panels of this Court have observed that Pennsylvania continues to follow the lex locus contractus rule,[4] we recognize

---

[4] <u>See</u> <u>Harry L. Sheinman & Sons v. Scranton Life Ins. Co.</u>, 125 F.3d 442, 444 (3d Cir. 1941); <u>New York Life Ins. Co. v. Levine</u>, 138 F.2d 286, 288 (3d Cir. 1943); <u>Faron v. Penn Mutual Life Ins. Co.</u>, 176 F.2d 290, 292 (3d Cir. 1949); <u>Roth v. Maryland Cas. Co.</u>, 209 F.2d 371, 373 (3d Cir. 1954); <u>Woods v. Nat'l Life & Accident Ins. Co.</u>, 347 F.2d 760, 763 n.2 (3d Cir. 1965); <u>Pittsburgh Bridge & Iron Works v. Liberty Mut. Ins. Co.</u>, 444 F.2d 1286, 1290 n.2 (3d Cir. 1971); <u>Jamison v. Miracle Mile Rambler, Inc.</u>, 536 F.2d 560, 563 n.1 (3d Cir. 1976); <u>McMillan v. State Mut. Life Assurance Co. of America</u>, 922 F.2d 1073, 1074-75 (3d Cir. 1990); <u>Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.</u>, 193 F.3d 742, 745-46 (3d Cir. 1999); <u>CAT Internet Serv. Inc. v. Providence Washington Ins. Co.</u>, 333 F.3d 138, 141 (3d Cir. 2003); <u>J.C. Penney Life Ins. Co. v. Pilosi</u>, 393 F.3d 356, 360-61 (3d Cir. 2004); <u>Canal Ins. Co. v. Underwriters at Lloyd's London</u>, 435 F.3d 431, 434 (3d Cir. 2006) (no dispute as to choice of law); <u>Regents of Mercersburg Coll. v. Republic Franklin Ins. Co.</u>, 458 F.3d 159, 163 n.4 (3d Cir. 2006) (noting another line of Pennsylvania cases looking to law of the state with most significant relationship).

In some of these cases, the parties did not challenge the applicable law, and thus the Court's choice of law discussion was dictum. <u>See, e.g.</u>, <u>Frog, Switch</u>, 193 F.3d at 745-46 ("The parties agree that the insurance contracts are governed by Pennsylvania law."). More significantly, all of the decisions

13

that the overwhelming weight of authority is to the contrary.

## B. **Contours of the *Griffith* Analysis**

### 1. **Classifying the Conflict**

Hammersmith contends that under <u>Griffith</u>, the Court must first determine whether there is a "false conflict" between the laws of Pennsylvania and New York. Our review of the case law indicates there is some inconsistency in the way Pennsylvania and federal courts have defined a false conflict.[5]

_____

rely either on cases that pre-date <u>Griffith</u>, or on <u>Crawford</u>, 221 A.2d 877 (Pa. Super. Ct. 1966). In <u>Melville</u>, however, we observed that <u>Crawford</u> "acknowledge[d] the winds of change portended by <u>Griffith</u>" by applying both the traditional lex locus contractus and <u>Griffith</u> approaches in selecting the law to govern a life insurance policy. <u>Melville</u>, 584 F.2d at 1312.

[5]At least three district court opinions have recognized this inconsistency in the case law. <u>See</u> <u>Naviant Marketing Solutions, Inc. v. Larry Tucker, Inc.</u>, No.Civ.A.00-6036, 2002 WL 15918, at *3 n.14 (E.D. Pa. Jan. 4, 2002) (noting the distinction and concluding that "a 'false conflict' arises not where there are no relevant differences in the laws of the two jurisdictions but rather, when there are relevant differences but the court may apply the law of one jurisdiction without affecting the governmental interests of the other jurisdiction"); <u>Air Prod. & Chem., Inc., v. Eaton Metal Prod. Co.</u>, 272 F.Supp.2d 482, 490 n.9 (E.D. Pa. 2003) ("Though the concepts are distinct, courts in Pennsylvania appear to use the term 'false conflict' to mean

14

One line of cases provides that a false conflict exists if there are no relevant differences between the laws of the two states, or the laws would produce the same result.[6] If there is a false conflict under this definition, the court does not have to engage in a choice of law analysis, and may refer to the states' laws interchangeably. Huber v. Taylor, 469 F.3d 67, 74 (3d Cir. 2006). If the states' laws do in fact conflict, the court must

---

both a situation in which no conflict at all exists ... and a situation in which only one state's interests would be harmed...."); Liebman v. Prudential Fin., Inc., No.Civ.A. 02-2566, 2003 WL 22741415, at *2 n.3 (E.D. Pa. Nov. 14, 2003) ("Third Circuit precedent varies slightly on the meaning of 'false conflict.'").

[6] See Huber v. Taylor, 469 F.3d 67, 74 (3d Cir. 2006) (noting if there is no "true conflict," the district court "may refer interchangeably to the laws of the states whose laws potentially apply"); Berg Chilling, 435 F.3d at 462 ("[W]here the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the Court should avoid the choice-of-law question."); Williams v. Stone, 109 F.3d 890, 893 (3d Cir. 1997) (same); Lucker Mfg. v. Home Ins. Co., 23 F.3d 808, 813 (3d Cir. 1994) (same); Coons v. Lawlor, 804 F.2d 28, 30 (3d Cir. 1986) ("If the various laws that might be applied to the case do not differ on the relevant issue, there is a false conflict."); Complaint of Bankers Trust Co., 752 F.2d 874, 882 (3d Cir. 1984) ("If the foreign law to which the forum's choice-of-law rule refers does not differ from that of the forum on the issue, the issue presents a 'false conflict.'").

15

determine which state has the "greater interest in the application of its law." Ratti v. Wheeling Pittsburgh Steel Corp., 758 A.2d 695, 702 (Pa. Super. Ct. 2000).[7]

A different line of cases holds that a "false conflict" exists "if only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's laws." Lacey v. Cessna Aircraft Co., 932 F.2d 170, 187 (3d Cir. 1991).[8]

---

[7] See also Budtel Assoc., LP v. Continental Cas. Co., No. 728 MDA 2005, 2006 WL 3718238, at *2 (Pa. Super. Ct. Dec. 19, 2006) ("[T]he first step in a choice of law analysis under Pennsylvania law is to determine whether a conflict exists between the laws of the competing states. If no conflict exists, further analysis is unnecessary. If a conflict is found, it must be determined which state has the greater interest in the application of its law.") (internal citations omitted); Thibodeau v. Comcast Corp., 2006 WL 3457582, at *11 (Pa. Super. Ct. Dec. 1, 2006) (same); Wilson v. Transp. Ins. Co., 889 A.2d 563, 571 (Pa. Super. Ct. 2005) (same); Keystone Aerial Surveys, Inc. v. Pennsylvania Prop. & Cas. Ins. Guar. Assoc., 777 A.2d 84, 94 (Pa. Super. Ct. 2001) (same).

[8] See also Garcia v. Plaza Oldsmobile Ltd., 421 F.3d 216, 220 (3d Cir. 2005) ("A true conflict exists 'when the governmental interests of [multiple] jurisdictions would be impaired if their law were not applied.'") (quoting Lacey, 932 F.2d at 187 n.15); Budget Rent-a-Car Sys., Inc. v. Chappell, 407 F.3d 166, 170 (3d Cir. 2005) (same); LeJeune v. Bliss-Salem, Inc., 85 F.3d 1069, 1071 (3d Cir. 1996) (same); Shuder v. McDonald's Corp., 859 F.2d 266 (3d Cir. 1988) (finding the existence of a "true

16

In that case, the court should "apply the law of the state whose interests would be harmed if its laws were not applied." Id. On the other hand, if the "governmental interests of both jurisdictions would be impaired if their law were not applied," there is a true conflict. Id. at 187 n.15 (emphasis in original). The court must then proceed with the choice-of-law analysis and apply the law of the state with the "most significant contacts or relationships with the particular issue." Budget Rent-a-Car Sys., Inc. v. Chappell, 407 F.3d 166, 170 (3d Cir. 2005) (quoting In re Estate of Agostini, 457 A.2d 861, 871 (Pa. Super. Ct. 1983)).

We think it is incorrect to use the term "false conflict" to describe the situation where the laws of two states do not differ. If two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law analysis is unnecessary. Thus, the first part of the choice of law inquiry is best understood as determining if there is an actual or real conflict between the potentially applicable laws. See, e.g., Air Prod. & Chem., 272 F.Supp.2d at 490 n.9 ("Before we even reach the 'false conflict' question, we must determine whether, for lack of better terminology, a 'real conflict' as opposed to 'no conflict' exists; that is, we must determine whether these states would actually treat this issue any differently.").

conflict" because the application of "the law of either Virginia or Pennsylvania [would] further the policies of that state"); Rosen v. Tesoro Petroleum Corp., 582 A.2d 27, 31 (Pa. Super. Ct. 1990) ("[T]his is not a case of 'false conflict,' because either state's interests would be disserved by the application of the other state's law....").

17

If there are relevant differences between the laws, then the court should examine the governmental policies underlying each law, and classify the conflict as a "true," "false," or an "unprovided-for" situation.[9]  A "deeper [choice of law] analysis" is necessary only if <u>both</u> jurisdictions' interests would be impaired by the application of the other's laws (i.e., there is a true conflict). <u>See</u>  <u>Cipolla v. Shaposka</u>, 267 A.2d 854, 856 (Pa. 1970) (deciding to "undertake a deeper analysis" because the plaintiff "is a resident of Pennsylvania which has adopted a plaintiff-protecting rule" and the defendant "is a resident of Delaware which has adopted a defendant-protecting rule"); <u>Rosen v. Tesoro Petroleum Corp.</u>, 582 A.2d 27, 30-31 (Pa. Super. Ct. 1990) (finding a "true conflict" between the malicious prosecution laws of Texas and Pennsylvania, where the underlying suit was brought in Texas against Pennsylvania residents, and the Texas law intended to provide litigants with "open access to the judicial system," while Pennsylvania's law intended to give greater protection to individuals "who may be forced to defend a baseless suit").[10]

---

[9] An "unprovided-for" case is one in which <u>neither</u> state's interests would be impaired if its laws were not applied. <u>Garcia</u>, 421 F.3d at 220.  In that situation, courts should apply the traditional, lex locus contractus rule.  <u>Id.</u>

[10] The Court notes that in <u>Lebegern v. Forman</u>, 471 F.3d 424 (3d Cir. 2006), we reached a different conclusion in analyzing New Jersey's choice-of-law principles.  In <u>Lebegern</u>, we held that a true conflict exists if the laws of the jurisdictions differ. <u>Id.</u> at 431.  If there is a true conflict, then the court should conduct a choice-of-law analysis, and consider the interests of

## 2.       Contacts and Interests Analysis

If a true conflict exists, the Court must then determine which state has the "greater interest in the application of its law." Cipolla, 267 A.2d at 856.  In Melville, we described the Griffith methodology as a combination of the "approaches of both [the] Restatement II (contacts establishing significant relationships) and 'interests analysis' (qualitative appraisal of the relevant States' policies with respect to the controversy)." 584 F.2d at 1311.[11]  This analysis requires more than a "mere

the states in having their laws applied. Id.  Although this was an appropriate assessment of New Jersey choice-of-law rules, we think Pennsylvania precedent dictates a different conclusion. In Lebegern, we emphasized that the New Jersey Supreme Court initiated its conflict analysis by "review[ing] the substance of the laws" and determining whether they differed. Id. at 430. "It was not until the second prong of the governmental interest test - assessing the interests of each jurisdiction - that the New Jersey Supreme Court entered into an in-depth discussion of the impact of the respective states' underlying policy goals and intent." Id. By contrast, in Cipolla, the Pennsylvania Supreme Court asked whether the interests of both states were implicated at the outset of the choice-of-law inquiry.  After deciding that they were, the court proceeded to conduct a "deeper analysis." 267 A.2d at 856.  Thus, under Pennsylvania precedent, we think the issue of a "false conflict" (defined in terms of states' interests in seeing their laws enforced) should be treated as a threshold matter.

[11] We later reaffirmed this formulation of Griffith in Carrick v. Zurich-American Ins. Group, 14 F.3d 907 (3d Cir. 1994),

counting of contacts." <u>Cipolla</u>, 267 A.2d at 856. "Rather, we must weigh the contacts on a qualitative scale according to their relation to the policies and interests underlying the [particular] issue." <u>Shields v. Consol. Rail Corp.</u>, 810 F.2d 397, 400 (3d Cir. 1987).

### C.        <u>Applying the *Griffith* Choice-of-Law Analysis</u>

As a threshold matter, we note that the TIG-DKM policy did not contain an express choice-of-law provision. However, the policy was entitled "New York Coverage Plus Umbrella Liability Policy," and it contained a New York cancellation endorsement and a New York state law conformance clause governing "operations in the State of New York." Contrary to TIG's assertions, we do not think these references to New York amount to an implicit agreement between TIG and DKM that New York law should govern the late notice issue. In <u>Assicurazioni Generali S.P.A. v. Clover</u>, 195 F.3d 161 (3d Cir. 1999), we concluded that "the parties at least implicitly and perhaps even explicitly" selected Indiana law to govern the policy because there were "repeated references" to Indiana law in the UIM endorsement. <u>Id.</u> at 165. In <u>Clover</u>, however, the arbitration clause at issue was contained in the state-specific endorsement. <u>See</u> <u>id.</u> at 164 ("[I]t is the Indiana UIM endorsement itself[,] not merely the policy, which contains the arbitration clause whose scope is at issue."). By contrast, the

--------

where we observed that the Pennsylvania Supreme Court had not "rendered any opinion ... impugning the validity of [this] exposition of Pennsylvania's flexible choice of law rule." <u>Id.</u> at 909.

20

notice requirement at issue in this case is not contained in any of the provisions that reference New York law.

### 1. Identifying and Classifying the Conflict

Applying the above framework, we must first determine whether there is an "actual" conflict between the New York and Pennsylvania late notice laws. Pennsylvania requires an insurer to establish it was prejudiced by an insured's late notice before it can disclaim coverage on those grounds (the "prejudice rule"). Brakeman, 371 A.2d at 198. Under New York law, "absent a valid excuse" for late notice, an insured's "failure to satisfy the notice requirement vitiates the policy" regardless of whether the insurer can show prejudice (the "no prejudice rule"). Security Mutual, 293 N.E.2d at 440. Because there are relevant differences between the New York and Pennsylvania late notice laws, we must proceed to the second prong of the inquiry and determine if this is a true or false conflict.

Hammersmith contends there is a false conflict because only Pennsylvania's interests will be harmed if the Court does not apply its law. Hammersmith reasons that the application of Pennsylvania law will not impair the interests underlying New York law because, if an insurer actually suffered "the harm New York's rule is intended to avert . . . [,] then [it could establish prejudice and] avoid its coverage obligation even under Pennsylvania law." Appellant's Br. 32. Conversely, applying New York's no-prejudice rule would impair Pennsylvania's interest in protecting an insured or accident victim from the "unnecessary forfeiture of insurance benefits." Id. at 31.

We disagree with Hammersmith and find there is a true conflict between Pennsylvania and New York law. As Hammersmith points out, Pennsylvania's prejudice rule is designed to safeguard the interests of the <u>insured and accident victim</u> by protecting them against forfeitures on technical grounds. <u>Brakeman</u>, 371 A.2d at 196-98 & n.8. On the other hand, New York's law, by requiring strict compliance with notice provisions, is meant to protect <u>insurers</u> from fraud or collusion, and enable them to "take an active, early role in the litigation process, and in any settlement discussions and to set adequate reserves." <u>Argo Corp. v. Greater N.Y. Mut. Ins. Co.</u>, 827 N.E.2d 762, 765 (N.Y. 2005). We believe both states' interests are implicated on the facts of this case. Although the named insured, DKM, had its headquarters in New York (App. 875a) and thus is not a Pennsylvania resident, the accident victim is a Pennsylvania domiciliary and was injured while working in Pittsburgh. In <u>Brakeman</u>, the Pennsylvania Supreme Court made clear that the prejudice rule serves the public interest by ensuring that accident victims are not denied "recovery against the insurance company because it received late notice of the accident, even though it suffered no prejudice as a consequence thereof." 371 A.2d at 198 n.8. New York's interests are also implicated even though the insurer, TIG, is not a New York resident. There is no evidence that New York intended its "no-prejudice" rule to protect only <u>resident</u> insurers, rather than <u>all</u> insurers doing business in the state of New York. Because TIG issued an insurance policy in New York to a New York resident, New York clearly has a regulatory interest in this

22

matter.[12] Thus, there is a true conflict between Pennsylvania and New York law, and we must determine which state has the most significant relationship to this dispute.

## 2. Contacts under the Restatement

We begin the analysis by assessing each state's contacts under the Second Restatement of Conflicts of Laws, bearing in mind that "[w]e are concerned with the contract of insurance" and not the underlying tort. McCabe v. Prudential Prop. & Cas. Ins. Co. 514 A.2d 582, 586 (Pa. Super. Ct. 1986). Section 193 of the Second Restatement specifically governs casualty insurance contracts, and provides that the "validity [of the contract] . . . and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless . . . some other state has a more significant relationship . . . to the transaction and the parties. . . ." Restatement (Second) of Conflict of Laws § 193. Comment b

---

[12] We decline to accept Hammersmith's broader argument that New York's interest in applying its no prejudice rule can never be harmed by enforcing a prejudice requirement because the laws serve identical goals. New York has decided that requiring strict compliance with notice provisions is the most effective means of protecting certain interests of insurance carriers. See Argo Corp., 827 N.E.2d at 764. We will not substitute our judgment for that of the New York courts by concluding that a prejudice rule would just as effectively serve these interests.

explains that courts should generally give the location of the insured risk "greater weight than any other single contact." Id. § 193 cmt. b. However, if the "policy covers a group of risks that are scattered throughout two or more states," the location of the risk has "less significance" to the choice-of-law determination. Id. Section 193 clearly reflects a "preference that only one set of laws govern a given insurance contract, and a disapproval of the possibility that the laws of different jurisdictions might apply to different risks under the policy." United Brass Works, Inc. v Am. Guar. & Liab. Ins. Co., 819 F.Supp. 465, 469 (W.D. Pa. 1992).

The insurance contract between TIG and DKM provided coverage for DKM's subsidiaries in more than twenty states and throughout the world. App. 1252a-1256a. In this case, then, there is no "principal location of the insured risk," and the significance of this factor is "greatly diminish[ed]." Compagnie, 880 F.2d at 690 (noting the "difficulty in defining, or even locating, the insured risk" because the equipment manufactured by the insured is "distributed throughout the world"); see also Gould Inc. v. Cont'l Cas. Co., 822 F.Supp. 1172, 1175-76 (E.D. Pa. 1993) (finding § 193 inapplicable because the "comprehensive general liability policy . . . was intended to insure the risks of business operations scattered throughout a number of states"); Manor Care v. Cont'l Ins. Co., No.Civ.A. 01-CV-2524, 2003 WL 22436225, at *6 (E.D. Pa. Oct. 27, 2003) (holding that § 193 did not apply where the insured facilities were located in thirty states).

Because § 193 is largely inapplicable, we turn to § 188(2) (the general provision governing contracts), which directs us to

24

take the following contacts into account: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. In Compagnie, we observed that when notice is at issue, the "location of the insured risk is further diminished in importance while factors like the location of the injury, the domicile of the parties, and the location of contracting and negotiation become relatively more important." 880 F.2d at 690. In particular, we explained, "[t]he place of contracting, negotiation, and performance are the most relevant contacts with respect to the notice procedures." Id. (quoting Sandefer Oil & Gas, Inc. v. AIG Oil Rig of Texas Inc., 846 F.2d 319, 324 (5th Cir. 1988)).


An insurance contract is made in the state where it is delivered. Harry L. Sheinman & Sons v. Scranton Life Ins. Co., 125 F.2d 442, 444 (3d Cir. 1941). The evidence in this case establishes that after TIG issued the policy, it was sent to New York for review by the underwriter. From there, it was forwarded to the broker, Brooks Wright, who was in either Connecticut or New York, and finally to Cynthia Leopold, DKM's director of risk management, in New York. Leopold Dep., App. 877a-878a. The record does not contain any more specific evidence regarding the state of delivery. See id. (indicating she did not know where the policy was delivered). Nonetheless, TIG contends we should presume New York was the state of delivery because New York is the residence of the insured, DKM. In light of the fact that DKM's headquarters are in New York, the insurance policy lists a New York address for

25

DKM, and the policy was sent to Leopold in New York for final review, we think it is fair to presume the policy was delivered in New York. See Jamison v. Miracle Mile Rambler, Inc., 536 F.2d 560, 563 n.1 (3d Cir. 1976) (presuming Pennsylvania was the state of delivery where the insured was incorporated and located in Pennsylvania, and the insurer engaged in business in Pennsylvania).

The second factor, place of negotiation, also points to New York. DKM's insurance broker, Aon Risk Services, Inc. of New York, is a New York corporation with its principal place of business in New York. Bryson, the wholesale broker which actually placed the TIG policy for DKM, is also located in New York. The application materials, as well as some of the revisions to the policy, were prepared in New York. See Wright Dep., App. 1150a (testifying that the application was prepared by Patrice Paz, the broker on the DKM account); Letter from Patrice Paz (Aon) to Kevin McLaughlin (Bryson), Jan. 9, 1997, App. 1298a-1300a (listing changes and corrections to be made to the policy). By contrast, there is no evidence that any part of the negotiations took place in Pennsylvania.

The next contact, place of performance, is the state in which notice should have been provided.[13] See Compagnie, 880 F.2d at 685 (assessing place of performance with respect to late notice, and discussing where notice had to be given and by

---

[13]Generally, an insurance contract is performed where the premiums are received. Gould, 822 F.Supp. at 1176. In this case, there is no record evidence of where DKM paid its premiums.

26

whom). Under the insurance contract, DKM, a New York resident, was responsible for providing notice of claims to TIG, a California corporation with its principal place of business in Texas. App. 1211a; 875a; 274a. DKM, in turn, relied on its New York broker, Aon, to provide notice to its carriers upon request. See Leopold Dep., App. 839a, 841a, 879a-880a; McConaghy Dep., 1087a. Presumably, notice of the claim was to be given to TIG in Texas. See Letter from Hayes Battle (AIG) to TIG, Oct. 19, 2000, App. 1707a-1708a (providing notice of claim to TIG in Irving, Texas). It is very likely, then, that Texas was the state of performance. However, between New York and Pennsylvania, the third factor favors New York because the entities responsible for providing notice under the insurance contract were located in New York.

The fourth factor, location of the subject matter of the contract, refers to the location of the insured risk. Manor Care, 2003 WL 22436225, at *7. Comment (e) provides that when the "contract deals with a specific physical thing such as land or chattel, or affords protection against a localized risk . . . the location of the thing or risk is significant." § 188 cmt. e. As we previously explained in our discussion of § 193, the insured risk in this case is spread throughout numerous states and countries. Therefore, this factor is neutral.

Regarding the parties' domiciles, we note that the only resident of Pennsylvania is Hammersmith, the accident victim. DKM (the named insured), Aon (the broker), and Bryson (the wholesale broker that procured the policy) are all located in New York. TIG is a resident of both California and Texas, and CCC (DKM's subsidiary that manufactured the conveyor) is

27

located in Texas.  Comment (e) explains that the significance of the parties' domiciles "depends largely upon the issue involved and upon the extent to which they are grouped with other contacts." § 188 cmt. e.  For example, "[t]he fact that one of the parties is domiciled or does business in a particular state assumes greater importance when combined with other contacts, such as that this state is the place of contracting or of performance. . . ."  Id.  In this case, where the issue is late notice, we think it is significant that New York domiciliaries were responsible for providing notice under the terms of an insurance policy which was issued, delivered and negotiated, at least in part, in New York.

Weighing the above contacts on a "qualitative scale," it is clear that New York has a more significant relationship to the insurance contract than Pennsylvania.  The only connection Pennsylvania has to this dispute is that the plaintiff resides, and alleged tort occurred, in Pennsylvania.  However, "we are [primarily] concerned with [the] contract of insurance, and, as to the insurance policy, [New York] has the most significant contacts." McCabe, 514 A.2d at 586.[14]

---

[14] The fact that TIG had a license to market insurance policies in Pennsylvania, and knew that DKM had subsidiaries in Pennsylvania, does not mean (as Hammersmith argues) that Pennsylvania has a greater interest in this dispute.  TIG's license to do business in Pennsylvania does not alter the fact that the insurance policy at issue is between a New York insured and a California/Texas insurer.  Likewise, the fact that DKM had worldwide subsidiaries, including ones in Pennsylvania, does not mean that Pennsylvania law should govern because the

28

### 3. Governmental Interests

Finally, the Court must consider the "interests and policies that may be validly asserted by each jurisdiction." Melville, 584 F.2d at 1311. We conclude that New York has the greater policy interest. Certainly, Pennsylvania has an interest in ensuring recovery for its accident victims. However, we believe New York's interest in regulating an insurance contract issued to a New York insured, negotiated by New York brokers, delivered in New York, and entitled "New York Coverage Plus Umbrella Liability Policy," is paramount.

Because, between Pennsylvania and New York, New York has the most significant relationship to the insurance contract, and the greatest governmental interest in seeing its laws enforced, we will apply New York law on the remaining

---

accident happened to have occurred in Pittsburgh. Under this logic, TIG could be subject to the laws of more than twenty-five states or countries under the DKM policy. Clearly, this runs contrary to the Restatement's "preference that only one set of laws govern a given insurance contract." United Brass Works, 819 F.Supp. at 469.

Additionally, we reject Hammersmith's claim that New York's contacts with the insurance policy are "fortuitous." Airplane crashes and car accidents are fortuitous. The location of a company's headquarters, and a parent's procurement of insurance coverage for its subsidiaries, are deliberate decisions.

29

issues to this dispute.[15]

## IV.  Timeliness of Notice to Excess Insurer

Hammersmith argues that the District Court erred when it decided as a matter of law that notice to TIG was untimely. According to Hammersmith, a reasonable jury could conclude, based on the evidence in the record, that DKM was not required to notify TIG of the Hammersmith claim until October 2000,

_____

[15] Hammersmith urges the Court to follow Harrow Stores, Inc. v. Hanover Insurance Co., 719 A.2d 196 (N.J. Super. Ct. 1998), where the court chose New Jersey law to govern an insurance dispute, even though the primary insured (Trojan) was a New York corporation and only manufactured its products in New York; the distributor of the allegedly defective product (Harrow Stores) was also a New York corporation; and the insurance contract was negotiated and consummated in New York. Id. at 199. The court was persuaded by the fact that the defective product was sold in New Jersey to a New Jersey resident. Id.

It is unclear how many vendors (other than Harrow Stores) were included in Trojan's vendor endorsement. If the endorsement covered a large number of distributors with geographically diverse locations, we question whether the court would have reached the same conclusion. In any event, we are not bound by the New Jersey Superior Court's choice of law determination. The contacts discounted by the court in Harrow Stores (e.g., the domicile of the insured, and place of negotiation and consummation of the contract) are of great significance under Pennsylvania precedent, and we must afford them appropriate deference.

30

when another product liability claim against DKM settled, reducing the total amount of coverage available under the National Union primary policy. Appellant's Br. 8-9. The District Court's legal conclusion on the voluminous evidence in the record on this allegedly late notice issue was as follows:

> We find that, viewing the facts in the light most favorable to plaintiff, TIG was not timely notified of the underlying accident and/or lawsuit. It is undisputed that DKM notified Aon the very day it learned plaintiff had filed a lawsuit. However, for reasons that are unclear, Aon never notified TIG, as it was required to do. Therefore, DKM is not entitled to coverage under its policy with TIG.

App. 15a.

## A. New York Law on Late Notice

Notice provisions in insurance contracts serve important policy purposes. They "enable insurers to make a timely investigation of relevant events and exercise early control over a claim," which may assist the parties in reaching settlement before litigation. Furthermore, timely notice allows insurers "to establish more accurate renewal premiums and maintain adequate reserves." Commercial Union Ins. v. Int'l Flavors & Fragrances, Inc., 822 F.2d 267, 271 (2d Cir. 1987).

31

A leading New York Court of Appeals decision addressing late notice provisions in insurance contracts holds that the failure to give timely notice alleviates an insurer of its obligation to provide coverage under an insurance policy because an insured's compliance with the notice provision of an insurance policy operates as a condition precedent for coverage. Late notice serves as a complete defense to liability, regardless of whether the insurer was prejudiced by the delay. Security Mut. Ins. v. Acker-Fitzsimons Corp., 293 N.E.2d 76, 78 (N.Y. 1972).

The principles established by Security Mutual and similar cases have been extended to claims involving excess insurance policies. The purposes of notice provisions are equally applicable to both primary and excess insurers. Prompt notice serves an "important function . . . in furnishing even an excess carrier with an opportunity to participate in settlement discussions at a time when its input is most likely to be meaningful." Am. Home Assurance Co. v. Int'l Ins. Co., 684 N.E.2d 14, 17 (N.Y. 1997).

However, while excess insurers have most of the rights and obligations of primary insurers, there is one essential distinction between them. Unlike primary insurers, excess insurers' "coverage does not immediately attach after an occurrence, but rather attaches only after the primary coverage for the occurrence is exhausted." Id.

As noted above, DKM's excess insurance policy with TIG dictates that, in the event of an occurrence which may result in a claim, or when a claim is made or a suit is brought, the

32

insured must see to it that notice is provided to TIG "as soon as practicable." App. 1211a. Furthermore, in the event of claim or suit, the policy requires the insured to "[i]mmediately send US copies of any demands, notices, summons or legal papers received in connection with the claim or SUIT." Id.

In a case of excess insurance, the Second Circuit, applying New York law, has observed that a notice provision similar to the one found in TIG's policy, which required notification to the excess insurer in the event of an occurrence, claim or suit, "obviously" does not require the "insured to give notice of suits that do not implicate the [excess] insurer's policy." Maryland Cas. Co. v. W.R. Grace & Co., 128 F.3d 794, 800 (2d Cir. 1997). The court continued, "[n]otice of 'suit' must mean notice of suit for recovery of damages for which the insurer might have to respond, and the same construction applies to notice of 'occurrence.'" Id.

Although the New York Court of Appeals has not considered an appeal from a grant of summary judgment with facts similar to the present case, its decision in Mighty Midgets, Inc. v. Centennial Insurance Co., 389 N.E. 2d 1080 (N.Y. 1979), affirming the trial court's declaratory judgment rejecting a disclaimer of coverage by the primary insurer, in an opinion by Judge Fuchsberg, is relevant to the present case because of the extended definition of the phrase "as soon as practicable":

> It is well settled that the phrase "as soon as practicable" is an elastic one, not to be defined in a vacuum. By no means does it

33

connote an ironbound requirement that notice be "immediate" or even "prompt", relative as even those concepts often are; "soon", a term close to each of these in common parlance, is expressly qualified in the policy here by the word "practicable". Nor was compliance with the insurance policy's temporal requirement to be measured simply by how long it was before written notification came forth. More crucial was the reason it took the time it did. So, the provision that notice be given "as soon as practicable" called for a determination of what was within a reasonable time in the light of the facts and circumstances of the case at hand.

Of course, there is no inflexible test of reasonableness. As with most questions whose answers are heavily dependent on the factual contexts in which they arise, rules of general application are hard to come by.

389 N.E. 2d at 1083 (citations omitted).

Therefore, where an insured offers a reason for its delay in providing notice, a fact finder must make a determination whether that delay was reasonable in light of the facts and circumstances of the case at hand. New York courts have recognized a number of valid excuses for a delay in notifying an insurer. For example, in New York, an insured's lack of knowledge of an accident or claim, or a good faith belief in non-liability or noncoverage, when reasonable, may excuse a delay in notifying its insurer. See Security Mut. Ins., 293 N.E. 2d at 78-79. In the case of an excess insurance policy, a delay in providing notice may serve as a valid excuse where the insured can demonstrate that the delay was "based on its initial reasonable, good-faith belief that the excess insurance would not be triggered." Morris Park Contracting Corp. v. National Union Fire Insurance Co. of Pittsburgh, 822 N.Y.S.2d 616, 620 (App. Div. 2006).

The insured bears the burden of establishing that it held a good faith belief that its insurance policy would not be implicated and that the belief was reasonable under all the circumstances. Security Mut. Ins., 293 N.E.2d at 78-79. "The existence of such a 'good-faith belief,' as well as the question of whether the belief was reasonable, are ordinarily questions of fact for the fact finder." Argentina v. Otsego Mut. Fire Ins. Co., 655 N.E.2d 166 (N.Y. 1995); Deso v. London & Lancashire Indem. Co. of America, 143 N.E. 889 (N.Y. 1957) (holding that, generally, the reasonableness of a delay in notifying an insurer is a question of fact for the jury). However, when no excuse is offered or no credible evidence exists to support an insured's contention that it had a reasonable, good faith belief that its excess insurance policy would not be triggered, courts will

35

decide this issue as a matter of law.  See Hartford Fire Ins. Co. v. Masternak, 390 N.Y.S.2d 949, 952 (App. Div. 1977); cf. Matter of Travelers Ins. Co., 672 N.Y.S.2d 219, 220 (App. Div. 1998) ("Where there is a credible basis to support the reason for the delay, the issue of reasonableness becomes one of fact.") Absent a excuse or mitigating circumstances, "even relatively short periods of delay have been found to be unreasonable as a matter of law." Todd v. Bankers Life & Cas. Co., 523 N.Y.S.2d 206 (App. Div. 1987); see, e.g., Deso, 143 N.E. at 889 (fifty-one day delay unreasonable as a matter of law); Rushing v. Commercial Cas. Ins. Co., 167 N.E. 450 (N.Y. 1929) (finding a twenty-two day delay unreasonable as a matter of law in the absence of explanation or excuse); American Ins. Co. v. Fairchild Indus. Inc., 56 F.3d 435, 440 (2d Cir. 1995) ("Under New York law, delays for one or two months are routinely held 'unreasonable.'")

There are four recent decisions by intermediate appellate courts in New York that address the question of whether an insured's delay in providing notice to an excess insurer was unreasonable as a matter of law.  One affirms a lower court's decision to deny summary judgment to an excess insurer on the issue of whether notice was unreasonably late, one rejects a lower court's decision as a matter of law that notice was unreasonably late, a third affirms a decision finding notice unreasonably late as a matter of law, and the fourth finds as a matter of law that notice was late.  We shall examine the facts of each case to determine whether the New York Court of Appeals would find that a court could determine DKM's delay in notifying TIG of the Hammersmith claims under the terms of

36

the TIG policy was unreasonable as a matter of law.[16]

In Morris Park Contracting Corp. v. National Union Fire Insurance Co. of Pittsburgh, the Second Department upheld the trial court's decision to deny summary judgment to the defendant-excess insurer because the plaintiff-insured raised triable issues of fact about whether its delay in notifying the excess insurer was the result of its initial reasonable, good faith belief that its excess insurance policy would not be triggered. 822 N.Y.S.2d at 620. The insured had been served with a personal injury complaint that contained an ad damnum clause for $10 million in damages but only made vague and generalized allegations of injury. Even though the insured's primary insurance policy limit was $1 million, the court found there were issues of material fact about whether the insured's notice to the insurer was untimely. The court observed, "it is the combination of the ad damnum figure and evidence regarding the seriousness of the injuries which triggers that obligation." Id.

The insured offered evidence that the nature and extent of the injuries to the opposing party in the underlying litigation did not become clear until it received a bill of particulars, seven months after the initial filing of the complaint, and that it

---

[16]See Michalski v. Home Depot, Inc., 225 F.3d 113, 116-17 (2d Cir. 2000) (holding that when there is an "apparent split in authority among the Appellate Divisions," a federal court applying New York law must predict how the New York Court of Appeals would resolve the issue, by examining "New York and, if necessary, other jurisdictions' case law").

37

notified the excess insurer of the claim eight days later. The insurer responded by arguing that the insured was aware of the extent of the party's injuries at least two months earlier, when the insured's counsel had sent a report to the primary insurer outlining various injuries and damages suffered by the opposing party. The court found, while this report constituted "some evidence" that the insured might have had sufficient information to notify the insurer of a possible excess coverage claim, "we are unable to reach such a conclusion as a matter of law on this record." Id. at 620. In addition, the court noted that the insured had presented evidence that it had been engaged in a good faith investigation of the accident and the injuries resulting from it, as well as its own potential liability, in the time period before it notified the excess insurer. Accordingly, the court held that "Morris Park succeeded in raising issues of fact and credibility regarding whether any period of delay in notifying [the excess insurer] of the claim was based on its initial reasonable, good faith belief that the excess insurance would not be triggered in this case." Id.

Therefore, for purposes of evaluating the late notice provision of an excess insurance policy, a court should consider "when the insured reasonably should have known that the claim against it would likely exhaust its primary insurance coverage and trigger its excess coverage, and whether any delay between acquiring that knowledge and giving notice to the excess carrier was reasonable under the circumstances." Id.

The second decision of relevance is Reynolds Metal Co. v. Aetna Casualty & Survey Co., 696 N.Y.S.2d 563 (App. Div. 1999). In Reynolds Metal, the operator of an aluminum

38

reduction plant sought indemnification for the clean-up costs of contamination caused by the plant. The Third Department held that the trial court erred when it granted summary judgment to the defendant excess insurers because the insured's notice to the defendants was untimely as a matter of law. See id. at 569-70. Noting that there was no evidence in the record that the insured had an estimate of the potential clean-up costs of contamination prior to its service of notice on the excess insurers, the court found that the "defendant excess insurers failed to tender sufficient evidentiary facts demonstrating plaintiff's knowledge prior to the summer of 1988, that its primary polices would be exhausted, implicating excess insurance coverage." Id. at 570.

In the third case, Long Island Lighting Co. v. Allianz Underwriters Insurance, 805 N.Y.S. 2d 74 (App. Div. 2005), a three-judge majority of the First Department held that excess insurers were not required to defend and indemnify plaintiff in an underlying action seeking environmental clean-up costs since the plaintiff had failed to give notice upon the happening of an occurrence "reasonably likely" to involve the policy. According to the majority, the "occurrence" took place almost six months before the insured was sued, when the insured received a letter from the plaintiff's lawyer threatening the lawsuit. The majority said:

> We reject plaintiff's argument that there was a reasonable possibility that the subject policies, both excess, would not be reached by the [plaintiff's] claim, where plaintiff offers no evidence that the timing

39

> of its notice was the result of a deliberate determination to that effect, and not, as the record suggests, the belief that it was not responsible for the . . . cleanup costs.

805 N.Y.S.2d at 75.

Two judges dissented, believing that there were questions of fact about whether it was reasonable for the insured to believe, notwithstanding the receipt of the letter, that it would be liable and whether the claim would implicate the excess policy. The dissent emphasized that "the well settled law of this jurisdiction is that an insurer's delay or failure to give timely notice may be excused when the insured has a reasonable belief that it would not be liable." Id. at 77. It also noted a distinction between the reasonableness of notice given for primary insurance as opposed to excess insurance. Id. at 78-79.

Finally, in Kamyr, Inc. v. St. Paul Surplus Lines Insurance Co., 547 N.Y.S. 2d 964 (App. Div. 1989), the Third Department reversed the trial court's decision to grant summary judgment to the plaintiff-insureds and instead granted partial summary judgment to the defendant excess insurer. It held that the plaintiffs' notice to the excess insurer of an incident over two years after it occurred "was untimely as a matter of law because plaintiffs had no good-faith belief in their nonliability regarding the [] incident." Id. at 967. The court reasoned that the plaintiffs were aware within a day or two of the incident that the damages from the incident would exceed the limits of their

40

primary insurance coverage, and the record was devoid of evidence showing any developments in the ensuing two years that would have changed the plaintiffs' concern that they would be found responsible for those losses. Furthermore, the court noted, approximately a year after the incident, but eight months before plaintiffs notified their excess insurers, plaintiffs' general counsel issued a report to the plaintiffs' auditor estimating that damages arising from the incident could run between $4 to $4.5 million, which far exceeded the limits of their primary policy. Id. at 967.

When considering whether a court may decide notice to an excess insurer was reasonable as a matter of law, the various intermediate appellate courts of New York apply the reasonableness and good faith standards enunciated by the Court of Appeals, but differ on the application of those standards to specific facts and circumstances. We conclude that as a federal court applying these legal standards, we must determine, in the context of Fed. R. Civ. P. 56, whether the issue of fact is "genuine," so as to require a jury trial.[17]

Federal courts, applying New York law, have held that notice was untimely as a matter of law where there was substantial evidence that the insured knew or should have known that the extent of the damages would exceed its primary policy but failed to give timely notice to its excess insurer. See

[17]A very recent case, Blue Ridge Ins. Co. v. Biegelman, 2007 WL 182056 (N.Y. App. Div. Jan. 23, 2007), found late notice as a matter of law because of an admitted broker mistake; the decision is not authoritative for the current appeal.

Green Door Realty Corp. v. TIG Ins. Co., 329 F.3d 282, 288 (2d Cir. 2003) (finding that rumors that someone had died in fire in plaintiff's building "put Plaintiffs on inquiry notice that they might be subjected to liability in excess of their primary insurance coverage, and any failure to investigate further and notify [excess insurer] was unreasonable as a matter of law").[18]

On balance, after reviewing New York law, we predict that the New York Court of Appeals, if reviewing a factual record similar to that discussed below, would adopt the decision in Morris Park. Where the insured has been able to show facts that it had a reasonable, good faith belief that a claim was not likely to exceed its primary policy coverage, the New York courts have refused to decide whether notice to the excess insurer was late as a matter of law.

Here, the District Court granted summary judgment to TIG concluding "DKM is not entitled to coverage under its policy with TIG" because Aon had failed to notify TIG as it was required to do. App. 15a. Hammersmith argues that the District

---

[18]See also Olin Corp. v. Ins. of N. Am., 743 F. Supp. 1044, 1052, 1054 (S.D.N.Y. 1990), aff'd, 929 F.2d 62 (2d Cir. 1991) (holding that the "duty to notify each excess insurer accrued when the circumstances known to Olin would have suggested a reasonable possibility of a claim that would trigger that excess insurer's coverage," even though it could "discern no material difference" between the language of the notice provisions in the excess insurance and those in the primary insurance); Olin Corp. v. Ins. of N. Am., 771 F. Supp. 76, 78 (S.D.N.Y. 1990), aff'd, 972 F.2d 1328 (2d Cir. 1992).

Court erred in reaching this conclusion. He contends there are genuine issues of material fact about when DKM should have known that its primary insurance policy was likely to be insufficient to cover the damages resulting from his claim. Although the District Court recognized that, on a motion for summary judgment the Court must view the evidence in the light most favorable to the non-moving party, very little of the detailed evidence in the record is reflected in the District Court's Memorandum. We agree with Hammersmith's contention, "there is much evidence suggesting that TIG received notice as soon as it became apparent that the National Union policy was likely to prove insufficient." Appellant's Br. 46.

While New York courts recognize the need to give an excess insurer notice of a possible claim implicating its policy in a timely manner in order to ensure its participation in settlement discussions, among other things, that obligation does not attach until a fact finder could conclude that an insured should have had a reasonable, good faith belief that the policy would be triggered. This is a factual inquiry that a court must refer to a jury unless there are no material facts in dispute about when an insured acquired sufficient knowledge to make its continued belief in noncoverage unreasonable. Therefore, the inquiry for this Court is to examine whether the district court erred in determining that DKM should have notified TIG upon first learning of the Hammersmith claim.[19]

---

[19] New York courts have not articulated a precise test for how to evaluate the evidence on the reasonableness of an insured's belief that its insurance policy would not be triggered. In reviewing the District Court's decision on this issue as a matter

43

## B. Facts of this Case Show a Genuine Issue of Fact As to Reasonableness of Late Notice

"We call that action reasonable which an informed, intelligent, justminded, civilized man could rationally favor." Quaker City Cab Co. v. Pennsylvania, 277 U.S. 389, 406 (1928) (Brandeis, J., dissenting). Hammersmith argues that there are genuine issues of material fact about when DKM should have known that its primary insurance policy was likely to be insufficient to cover the damages resulting from his claim. Although the District Court recognized that, on a motion for summary judgment the Court must view the evidence in the light most favorable to the non-moving party, very little of the detailed evidence in the record is reflected in the District Court's Memorandum. We agree with Hammersmith's contention, "there is much evidence suggesting that TIG received notice as soon as it became apparent that the National Union policy was likely to prove insufficient." Appellant's Br. 46.

Hammersmith cites evidence that both Hayes Battle, an experienced claims handler from AIG, the National Union affiliate handling DKM claims, and CCC's defense attorney, Brennan Hart, a trial attorney with twenty-five years experience particularly in the area of products liability, believed that the

---

of law, the most useful inquiry for this Court is to determine the latest time at which there were material facts in dispute about the reasonableness of DKM's belief that its excess policy with TIG would not be implicated. This does not mean, however, that a fact finder weighing the evidence could not find that the obligation arose at a much earlier time.

44

Hammersmith claim would not exceed the primary policy limits well into the year 2000. Appellant's Br. 46-47; <u>see e.g.</u> App. 695-96a, 706-07a, 1662-67a, 1696-97a.

The number of companies and individuals who participated in the administration and oversight of DKM's insurance policies with respect to the Hammersmith claim make the factual background of this case unavoidably complicated. DKM first became aware of Hammersmith's accident and lawsuit on October 16, 1998, when it received a copy of a writ of summons from Allegheny County joining CCC to the action. The complaint alleged that the accident had damaged Hammersmith's spinal cord and rendered him quadriplegic, but did not allege a specific amount of damages. App. 50-51a ¶¶ 10-19, 115a ¶¶ 38-39, 1496-1508a. John Fitzsimmons, DKM's general counsel and corporate secretary for CCC, then forwarded the writ of summons and other correspondence relating to the lawsuit to Cindi Leopold, DKM's Director of Risk Management, (App. 837a), and noted in his forwarding memorandum "[p]resumably we should notify our carrier of this matter." App. 54a ¶¶ 34-35. Ms. Leopold, in turn, sent the writ of summons, followed by a copy of the complaint a few days later, to James Coen at Aon, DKM's insurance broker for its casualty program, with a note requesting Aon to "Pls. notify insurer." App. 1489-1495a. Aon then forwarded the documents from DKM to Gallagher Bassett Services ("GBS"), the third-party administrator or claims adjustor to both DKM and AIG Vendor Services ("AIG"), the representative of National Union on the Hammersmith case. At GBS, Judith Diehl served as the claims representative who had primary responsibility over the Hammersmith claim. App. 58a ¶ 57. At AIG, Richard Crooks

45

and Hayes Battle, both experienced claims handlers, oversaw the Hammersmith claim. App. 58a ¶¶ 59-61.

On October 30, 1998, GBS retained attorney P. Brennan Hart to represent CCC in the Hammersmith case. App. 56a ¶ 45. In his role as defense counsel for CCC, Mr. Hart periodically reported to GBS on the status of the case, and GBS, in turn, provided reports to DKM, AIG, and, subsequently, to TIG. App. 57-58a ¶¶ 55-56. At the time that he was retained by GBS to represent CCC, Mr. Hart had been practicing law as a trial attorney for twenty-five years and had worked on numerous product liability cases, including several multiple-fatality loss claims. App. 56a ¶¶ 47-48. After August 1999, Joseph Cullens, also a trial attorney with extensive experience in product liability claims involving heavy machinery, joined Mr. Hart as national supervisory co-counsel. App. 55-57a ¶¶ 52-54.

For the first few months after DKM received notice of the Hammersmith claim, none of the people involved expressed a belief that the damages resulting from the claim would exceed the limits of DKM's primary insurance policy. In fact, Hart testified in his deposition that CCC and its attorneys initially believed that CCC faced little or no liability for Hammersmith's accident. Hart. Dep., App. 685-86a; see also Cullens Dep., App. 528a (stating he thought CCC was a "minor player" from a liability standpoint). He pointed out that the original design of the conveyors manufactured and installed by CCC had maintenance catwalks and, in his assessment, the responsible parties were the parties who had removed the catwalks from the original design, including the architect and the baggage consulting firm. Hart Dep., App. 685-87a. The same attitude

46

was reflected in GBS's and AIG's early treatment of the claim. On March 4, 1999, AIG "decontrolled" the claim and sent it back to GBS for handling, noting that it would not actively monitor the case unless the assessed exposure exceeded $150,000 or the case took an unusual or significant turn that would warrant its involvement. Letter from Richard Crooks to John T. Ward, Mar. 4, 1999, App. 1620-21a. From December 21, 1998 until April 7, 1999, GBS assigned 0% of the liability to CCC and set a maximum reserve of $20,000 for the claim. App. 1537-40a.

As more facts emerged about the role of CCC and its co-defendants in Hammersmith's accident and the nature of his injuries, the estimates about the settlement value of the case increased. On July 23, 1999, Hart sent a letter to GBS, which was carbon copied to representatives of Aon and DKM, estimating that the settlement range for the Hammersmith claim was in excess of $3 million, based on a potential jury verdict of $3 to $7 million. Letter from P. Brennan Hart to Judith Diehl, July 23, 1999, App. 1625a. However, Hart specified in his deposition that those estimated verdict and settlement ranges represented the liability for all defendants and not just CCC, an interpretation also shared by DKM's general counsel. Hart Dep., App. 692-93a; Fitzsimons Dep., App. 639a, App. 424-25a. Furthermore, while Hart conceded that there was a possibility that a single defendant could be held jointly and severally liable for the entire verdict, he stated that he had never seen such an event occur, and that he "could not see a verdict coming in against CCC alone under any circumstances." Hart Dep., App. 692-93a, 744a.

47

In response to Hart's July 1999 letter, GBS set a $2 million reserve for the Hammersmith case, which included both DKM's self-insured retention of $250,000 and the $1,750,000 AIG policy. Controlled Loss Report (Update) from Judith Diehl to Cindi Leopold, July 28, 1999, App. 1629-30a. Copies of the "Controlled Loss Report" from GBS reflecting that reserve were sent to both DKM's Leopold and Aon's Coen, and similar reports were sent to the same individuals on October 26, 1999 and January 13, 2000. App. 1627a, 1635a, 1648a. Hart thought GBS's $2 million reserve was appropriate. Hart Dep., App. 690a; Letter from P. Brennan Hart to Judith Diehl, Oct. 21, 1999, App. 1639-40a.

During her deposition, DKM's Leopold testified from a chronology she had prepared, (App. 1943a), that she believed that Aon "should have notified TIG" of the Hammersmith claim as soon as the severity of the claim warranted it, and that GBS's July 1999 decision to set "substantial reserves" constituted such a trigger. Leopold Dep., App. 865a. According to TIG, this statement was a concession on DKM's part that it was obligated to notify TIG by mid-1999 at the latest of the Hammersmith claim, a full fifteen months before TIG actually received that notice. Appellee's Br. 45. However, Leopold specifically said she did not know if TIG's late notice defense was "well founded." Leopold Dep., App. 888a.

The Controlled Loss Report sent by GBS's Diehl to Leopold on July 28, 1999, reported that, "[i]f either the architect or the baggage consultant company are responsible for the design system, defense counsel is of the opinion that CCC, [t]he [a]rchitect, and baggage consultant firm have a shared exposure

48

of 1/3 each." Controlled Lost Report from Diehl to Leopold, App. 1630a. The Report goes on to note that, based on information currently available, the general consensus among defense counsel was that the architect and or/baggage consultant were in fact responsible for the design. Consequently, the Report concludes that "we are basing our reserves on the assumption that the records will eventually prove that the architect and/or the baggage consultant are responsible for the design." GBS set the settlement value of the claim at $3-5 million with a potential verdict of $6-7 million. Provided that the parties were able to settle the claim, GBS believed as of July 1999 that CCC would ultimately only be required to pay $1 to $1.7 million on the claim. While a jury verdict could have presumably exceeded the estimated settlement value of the claim, the defendants repeatedly emphasized their desire and belief that the case would settle. See, e.g., Hart Dep., App. 708a (testifying that, as of late August 2006, he believed the case was going to settle); Letter from Richard Crooks to Nanette Goodman, Dec. 29, 1999, App. 1644-45a, ("[I] fail to see how extensive litigation will serve to mitigate the loss."); Battle Dep., App. 313a. Despite Leopold's opinion that the excess insurer "should have been notified," taking these facts in the light most favorable to Hammersmith, the Court cannot conclude that it was unreasonable as a matter of law for DKM to believe that its excess policy would not be triggered as of July 1999.

Five months after GBS increased its reserve, on December 29, 1999, Richard Crooks, claims handler for AIG, the administrator for DKM's primary insurance policy, sent a letter to GBS, which was copied to DKM's Leopold and Aon's

Coen, among others, stating that the Hammersmith claim "is a claim of adverse liability against the insured and one I should begin posturing for resolution within our policy limits or for tendering to the excess insurer." Letter from Richard Crooks to GBS, Dec. 29, 1999, App. 1644-45a. He advised GBS to begin "thoroughly documenting the full scope of the damages and the insured ultimate liability exposure so we can properly notify all concerned parties regarding the potential [*sic*] represented by this matter." Id. On the same day, Crooks sent a letter directly to Aon's James Coen, which was copied to Leopold, among others, concluding that "[t]he facts of this loss indicate that this is a claim of adverse liability against the insured with serious damages. It is our opinion that this matter has the potential to exceed the insureds' $1,750,000 policy limits. Accordingly, we are writing to suggest that you place the appropriate excess insurers on notice of this matter." Letter from Richard Brooks to James Coen, Dec. 29, 1999, App. 1646a.

Crooks did not recall ever receiving a response from Coen to his letter. Crooks Dep., App. 478a. According to Leopold, she assumed that Aon would have followed AIG's suggestion to provide notice to TIG of the Hammersmith claim. Leopold Dep. 862a. Coen viewed the situation differently. When asked about how he would have responded to the suggestion from Crooks at AIG to notify DKM's excess insurer, "I wouldn't have done that. The only person who could – who would tell me I have the right, who could grant me that right is the client themselves." Coen Dep., App. 415a.

As of late December 1999, it is clear that Richard Crooks believed that DKM should have notified its excess insurer of the

50

Hammersmith claim, and that he had informed representatives from Aon and DKM of his opinion. The question is whether it was reasonable, in light of this correspondence, for DKM to continue to believe that its excess insurance policy would not be triggered. On this record, it is difficult to discern whether Leopold or Coen actually held a good faith belief at the end of 1999 that notice to the excess insurer was unnecessary. One of the difficulties presented by this case is that it appears that neither Leopold nor Coen recalled their contemporaneous reactions to this correspondence and, instead, testified at their depositions on what they believed they would have done or expected at that time. Coen Dep., App. 415-17a; Leopold Dep. 865-67a. Because of this uncertainty, taking the facts in the light most favorable to Hammersmith, the Court concludes that the evidence in the record could lead a jury to decide that DKM held a good faith belief its excess policy would not be triggered.

Furthermore, when Crooks sent his letters in late December 1999, he had not yet completed a full evaluation of the case and had not yet recommended a reserve level for National Union. Crooks Dep., App. 499-500a, 505a. It was not until March 1, 2000 that Crooks prepared an internal memorandum, called a High Cost Narrative, estimating that, "[b]ased on the limited information presently available and the allegations being made by co-defendants," 70 to 90 percent of the liability for the Hammersmith claim could be assessed against CCC. He recommended that AIG increase its own reserve to $2 million, in line with GBS's reserve, a recommendation AIG adopted. High Cost Narrative Liability Memorandum from Richard Crooks, Mar. 1, 2000, App. 1658-1661a; Crooks Dep. 488-492a. However, the same

51

memorandum also reveals that, as of March 1, 2000, AIG did not have a definitive assessment of Hammersmith's damages. Crooks notes under the heading "Plaintiff Damages/Injury" that, "[t]o date, the plaintiff has not presented us with an economic expert's report," although he estimated that Hammersmith's future medical care and lost wages would exceed $1 million each. High Cost Narrative, Mar. 1, 2000, App. 1659a. In fact, it appears from the record that defense counsel did not receive a specific damages statement from Hammersmith until October 26, 2000, when Hammersmith's attorney forwarded a copy of a life care plan for Hammersmith, which estimated the costs of Hammersmith's future medical care at $9,844,000. Letter from Michael H. Rosenzeig to Robert E. Dapper, Jr., Oct. 26, 2000, attaching Projected Life Care Plan, July 3, 2000, App. 1710a, 1731a. TIG received notice of Hammersmith's claim at the end of October 2000.

Contrary to Crooks' position, the evidence in the record shows that other individuals, including Attorney Hart and Richard Crooks' successor at AIG, Hayes Battle, assessed the value of the Hammersmith claim well into late 2000 as unlikely to exhaust the limits of DKM's primary insurance policy. When asked about his reaction to Crooks' December 29, 1999 prediction that the Hammersmith matter had the potential to exceed the insurer's $1,750,000 policy limits, Hart testified that "[i]t had the potential, depending on the what the verdict ultimately came to be, but I still believed that all parties would be paying, all defendants would be contributing to the settlement, or the verdict, whichever way it turned out." Hart Dep., App. 695-96a. Indeed, there is some evidence in the record suggesting that Hart believed that CCC's overall

52

exposure was actually decreasing.  On January 24, 2000, Hart sent a letter to GBS, which was copied to Aon's Coen and DKM's Leopold, stating "as the number of defendants increase I believe that our overall exposure decreases" although he qualified that assertion by noting that "Plaintiff still views CCC as one of the primary target defendants in this case."  Letter from P. Brennan Hart to Judith Diehl, Jan. 24, 2000, App. 1656a.

Moreover, Hart's "Defense Attorney Suit Status Report" to GBS dated March 2000 predicts a verdict of $3 million to $8 million in favor of Hammersmith, but expressly notes that "there is a significant likelihood that most, if [sic] all of the co-defendants will be held into the case in relatively equal percentages."  Defense Attorney's Suit Status Report, Mar. 20, 2000, App. 1662-67a.  While a verdict for Hammersmith had the potential to exceed the limits of DKM's primary insurance policy, Hart's report emphasized that the co-defendants wanted to settle the case, opining that "[o]ur chances of a defense verdict are zero."  App. 1667a.  During a conference call in April 2000 with AIG personnel, Hart made an estimate of what those settlement percentages would be.  He assessed the settlement value of the case as between $5 million and $7 million, of which CCC would be responsible for 25 percent. Hart Dep., App. 706-707a.  Attorney Cullens characterized this apportionment of liability as a "worst case scenario."  Cullens Dep., 532-33a, 536a.  Thus, the records shows that CCC's main defense attorney believed in April 2000 that the Hammersmith claim was likely to settle for less than the value of DKM's primary insurance policy.

53

This belief was also held by Crooks' successor at AIG. In August 2000, Hayes Battle took over as AIG's claims handler on the Hammersmith case from Richard Crooks, who had left the company. Battle Dep., App. 310a. On August 26, 2000, Battle wrote an internal file memorandum indicating that Hammersmith had made a settlement demand for $14 million, but that defense counsel estimated the settlement range of the case as in the area of $5 million to $5.5 million, with the potential exposure to DKM in the range of $1.5 to $ 2 million. Memorandum from Hayes Battle to File, Aug. 26, 2000, App. 1696a. Battle concluded that "[o]ur ground-up reserve is currently set at $2 million dollars and it appears adequate at this time." Id.; Battle Dep., App. 313a.

On September 20, 2000, Hayes Battle wrote another file memorandum noting that, while TIG was listed as the excess insurer on CCC's policy, "[w]e have not hear[d] and/or received anything from TIG, to date." He went on to conclude that the Hammersmith case "might resolve without any participation from TIG as a result of contribution from the co-defendants and the use of a structured settlement." Memorandum from Hayes Battle to File, Sept. 20, 2000, App. 1697a; Battle Dep., 314a. Hart agreed with this September 2000 assessment of the case. Hart Dep., App. 748a.

However, in October 2000, another claim against DKM (the "Melba" claim) was settled, and the combined reserves from the Melba claim and the Hammersmith claim exceeded the aggregate limit of DKM's insurance policy with National Union for product liability claims. Battle Dep., App. 316-320a. As a result, on October 19, 2000, Battle, who assumed from the

54

notice sent to the broker that TIG had been notified, (App. 315a), sent a letter to TIG informing them that the incurred reserves on the Hammersmith and Melba claims "are equal to and/or exceed[] National Union's $1,750,000 'Products Liability Aggregate' limit." Letter from Hayes Battle to TIG, Oct. 19, 2000, App. 1707-08a. Battle testified that, because payment of the Melba claim reduced the amount available under the National Union policy, "as a courtesy, I sent this letter to make them aware of that." Battle Dep., App. 316a. TIG received Battle's letter on October 30, 2000, opened a claim file, and assigned the matter to claims specialist Terri Long. App. 60a ¶¶ 68-69. TIG contends that this is the first notice it received of the Hammersmith claim, and there is nothing in the record to dispute this. Battle also testified that the first time he believed that the suit could not be settled within the limits of the National Union policy was when he attended the mediation on November 9, 2000. App. 326a.

We cannot conclude as a matter of law on a summary judgment record, without cross examination of witnesses, that this notice was untimely. The serious nature of Hammersmith's injuries is insufficient, standing alone, for a court to find as a matter of law that TIG was entitled to receive notice of Hammersmith's suit shortly after DKM first received a writ of summons in October 1998. It is telling that, despite the allegations in the complaint that the plaintiff had suffered a spinal cord injury and was rendered quadriplegic, neither GBS or AIG chose to set the reserve level on their policies at $2 million until July 1999 and March 2000, several months after first receiving notice of the case. The arguably limited role CCC played in the design of the conveyor, particularly in

55

relation to the involvement of its co-defendants, in the facts causing Hammersmith's injuries, was material to both the defense attorneys' and the insurance administrators' assessment of the claim. Further, it appears from the record that new facts about the possible settlement value of the case, based on the solvency of CCC's co-defendants and their role in contributing to Hammersmith's accident, as well as the plaintiff's future medical expenses and future lost wages, were in constant flux during the two year period leading up to the notification of TIG about the claim. See, e.g,. High Cost Narrative Liability, Mar. 1, 2000, App. 1659a (listing the numerous gaps in information "clouding" AIG's assessment of CCC's liability); Controlled Loss Report (Update), Jan. 10, 2000, App. 1650a (describing the numerous factual issues still outstanding in the Hammersmith case).

These facts led the various insureds' representatives overseeing the Hammersmith insurance claim to draw very different conclusions about CCC's potential exposure. The reasonableness of their decision not to notify TIG should not be taken from a jury. In particular, as Hammersmith points out in his brief, both Hart and Battle testified that they believed into late 2000, that the limits of DKM's primary policy would be adequate to address the claim. Appellant's Reply Br. 17.

The standard applied by the District Court did not fully reflect New York jurisprudence interpreting a requirement in an excess insurance policy that notice of an occurrence or claim be given "as soon as practicable." It merely requires "that notice be given within a reasonable time under all the circumstances." Security Mut. Ins., 293 N.E.2d at 79. Furthermore, under New

56

York law, an insured's good faith belief that its excess insurance policy would not be triggered, where reasonable, may excuse a "seeming failure to give timely notice." Id.; Morris Park, 822 N.Y.S. 2d at 620. In Morris Park, the court noted that "[t]he resolution of such questions of reasonableness is 'heavily dependant on the factual contexts in which they arise.'" 822 N.Y.S. 2d at 619 (quoting Mighty Midgets, 389 N.E.2d at 1084). Where the insured has been able to show that there are triable issues of fact about when it reasonably should have known that a claim was likely to exceed its primary policy coverage, New York courts have refused to decide this issue as a matter of law.

Given the conflicting information, reasonable people can disagree as to when DKM reasonably should have known that the claim would likely exceed primary coverage. Construing the facts in favor Hammersmith, in light of the numerous material issues of fact he has raised, the Court holds that the District Court erred when it decided that DKM's notice to TIG was untimely as a matter of law.

## V.     **Timeliness of Disclaimer**

Hammersmith claims the District Court erred in concluding as a matter of law that TIG "disclaim[ed] coverage within a reasonable period of time."[20] App. 12a. Under New

---

[20] Hammersmith moved for partial summary judgment on the ground that TIG unreasonably delayed disclaiming coverage. The District Court denied Hammersmith's motion, and concluded that TIG's disclaimer was reasonable as a matter of law - effectively granting summary judgment on this issue in

57

York law, insurers are required by statute to disclaim coverage for "death or bodily injury arising out of . . . [an] accident occurring within [New York] . . . as soon as is reasonably possible. . . ." McKinney's Ins. Law § 3420(d). Because Hammersmith was injured in Pennsylvania, § 3420(d) is inapplicable. However, the New York common law rule of estoppel applies. See Am. Home Assurance Co. v. Republic Ins. Co., 984 F.2d 76, 79 (2d Cir. 1993) (concluding that § 3420(d) did not apply to an out-of-state accident, but considering issue of late disclaimer under common law principles); Royal Ins. Co. v. Commercial Underwriters Ins. Co., No.03 Civ. 8325 (NRB), 2004 WL 2609522, at *3 (S.D.N.Y. Nov. 17, 2004) ("Without statutory regulation, the timeliness of disclaimer is governed by equitable principles. . . .").

A court may estop an insurer from disclaiming coverage if the insurer "acts in a manner inconsistent with a lack of coverage, and the insured reasonably relies on those actions to its detriment." Burt Rigid Box, Inc. v. Travelers Prop. Cas.

---

favor of the non-movant, TIG. See National Expositions, Inc. v. Crowley Maritime Corp., 824 F.2d 131, 133 (1st Cir. 1987) (collecting cases recognizing that a "district court has the legal power to render summary judgment . . . in favor of the party opposing a summary judgment motion even though he has made no formal cross-motion under rule 56") (internal quotations omitted); Banks v. Lackawanna County Comm'rs., 931 F.Supp. 359, 363 n.7 (M.D. Pa. 1996) ("A district court may grant summary judgment in favor of a non-movant where it believes that the movant has had adequate notice of the grounds for that judgment, and where there is clear support for such judgment.").

Corp., 302 F.3d 83, 95 (2d Cir. 2002). An <u>unreasonable</u> delay in disclaiming coverage qualifies as an "act inconsistent with a lack of coverage." <u>Id.</u> Thus, in order to take advantage of the equitable principle of estoppel, Hammersmith must establish that TIG unreasonably delayed disclaiming coverage, <u>and</u> he suffered prejudice as a result. <u>Fairmont Funding, Ltd. v. Utica Mut. Ins. Co.</u>, 694 N.Y.S.2d 389 (App. Div. 1999).[21] Although § 3420(d) does not apply to TIG, cases interpreting the reasonableness of an insurer's delay under § 3420(d) are informative in assessing the timeliness of TIG's disclaimer.

We measure the timeliness of an insurer's disclaimer "from the point in time when the insurer first learns of the grounds for disclaimer of liability or denial of coverage." <u>First Fin. Ins. Co. v. Jetco Contracting Corp.</u>, 801 N.E.2d 835, 838-39 (N.Y. 2003). The reasonableness of delay will "depend[] upon the circumstances of the case which make it reasonable for the insurer to take more or less time to make, complete, and act diligently on its investigation of its coverage or breach of conditions in its policy." <u>Allstate Ins. Co. v. Gross</u>, 265 N.E.2d 736, 739 (N.Y. 1970). If the basis for disclaimer is "readily

---

[21] Because the District Judge concluded that TIG's disclaimer was reasonable as a matter of law, he did not consider whether the insured was prejudiced by the eleven month delay. As we discuss below, Hammersmith has raised numerous issues of material fact with respect to the reasonableness of TIG's delay in disclaiming coverage. Accordingly, upon remand, the District Judge must proceed to the second part of the inquiry, and consider whether there are genuine factual disputes on the issue of prejudice.

59

apparent from the face of the claim," New York courts have held that relatively short periods of delay are unreasonable as a matter of law.  See Milbank Hous. Dev. Fund v. Royal Indem. Co., 794 N.Y.S.2d 23 (App. Div. 2005) (finding delay of more than 60 days unreasonable as a matter of law when grounds for disclaimer were readily apparent from documents submitted to insurer); Squires v. Robert Marini Builders, Inc., 739 N.Y.S.2d 777, 780 (App. Div. 2002) (42 days); W. 16th Street Tenants Corp. v. Public Serv. Mut. Ins. Co. 736 N.Y.S.2d 34, 35 (App. Div. 2002) (30 days).

On the other hand, "if an insured's claim requires investigation into its validity, an insurer must be given reasonable time to investigate adequately whether it should disclaim." Mount Vernon Fire Ins. Co. v. Kent Dev. of N.Y., No. 93 Civ.3919, 1996 WL 521426, at *3 (S.D.N.Y. Sept. 12, 1996).  When an insured has delayed notifying the insurer of the claim, the "length of the delay may be relevant" to the reasonableness of the insurer's delay in disclaiming coverage. Safeguard Ins. Co. v. Angel Guardian Home, 946 F.Supp. 221, 229 (E.D.N.Y. 1996).

TIG first received notice of the Hammersmith claim on October 30, 2000, and formally disclaimed coverage on late notice grounds on October 5, 2001.  TIG contends the eleventh month delay was reasonable because during this time it was conducting an investigation of the late notice issue, and DKM and Aon persistently refused to provide it with information necessary to make an informed coverage decision.  Although the record certainly contains evidence that Aon and DKM were less

than forthcoming with TIG,[22] the record is equally replete with evidence that TIG failed to conduct its investigation in a reasonable, diligent and prompt manner.

Upon receiving notice of the Hammersmith claim, TIG "almost immediately" identified late notice as a potential ground for disclaimer. See Long Dep., App. 927a; E-mail from Valerie Lameka to Terri Long, Oct. 30, 2000, App. 1790a. On

---

[22] In the November 7, 2000 reservation of rights letter, TIG asked DKM to provide it with certain information relating to the late notice issue, including "an explanation as to why TIG was not provided notice at an earlier date." Letter from Terri Long to Cynthia Leopold, Nov. 7, 2000, App. 1830a-1831a. In Aon's response, James Coen indicated that answers to the late notice questions would be "forwarded under separate cover." Letter from James Coen to Terri Long, Dec. 15, 2000, App. 1865a. Despite this promise, Aon did not provide TIG with the requested information. See Claim Note by Hayes Battle, June 12, 2001 ("[Aon has] decided not to respond to [the] request [for a response to the notice issue] for now."). On September 18, 2001, Cynthia Leopold, DKM's corporate risk manager, directly answered some of TIG's questions. See Letter from Cynthia Leopold to Terri Long, Sept. 18, 2001, App. 1953a (informing TIG that DKM was first notified of the Hammersmith accident and claim on October 16, 1998). However, Leopold also assured Long that a "response will be forthcoming from Aon" with respect to why TIG was not provided notice at an earlier date. Id. Aon never provided TIG with a response, despite promising to do so again in an October 1, 2001 letter. Letter from James Coen to Terri Long, Oct. 1, 2001, App. 1974a.

61

November 7, 2000, claims specialist Terri Long sent DKM a reservation of rights letter, specifically identifying late notice as an issue, and requesting that DKM provide it with certain information relating to the underlying suit, including the date on which the insured first received notice, and an explanation as to why TIG was not notified earlier. App. 1830a-1831a. Aon responded on behalf of DKM on December 15, 2000 by sending TIG a copy of DKM's primary insurance policy, and noting that answers to the late notice questions would be forthcoming. App. 1865a. Although Long never received this additional information from Aon or DKM, she did not even begin to draft a follow-up letter until February 16, 2001. App. 1873a. Despite the instructions of her technical supervisor, Kathleen Fikes, to "really push for this info and stay on top of it until you get what is needed," Long did not actually send the February 16 draft to Aon until March 6, 2001. App. 1875a

On June 19, 2001, Stephen Jacobs, TIG's coverage attorney, forwarded a draft of a second reservation of rights letter to Long. The letter reiterated TIG's request for certain information, and highlighted an additional coverage issue relating to the plan's "wrap-up" policy. App. 1900a-1903a. Although both Jacobs and Fikes believed the letter was mailed in June, Long did not actually send it to DKM until September 6, 2001. See E-mail from Kathleen Fikes to Terri Long, July 18, 2001, App. 1926a ("May I have a copy of the ROR that went out last month?"); E-mail from Stephen Jacobs to Terri Long, Aug. 7, 2001, App. 1927a ("[I]t occurred to me to see whether you had gotten any response to the letter I believe you sent out the second half of June. If not, I suggest either a final follow-up letter or disclaimer.").

These unexplained gaps in the investigation raise material issues of fact as to whether it was reasonable for TIG to take eleven months to disclaim coverage. Although the District Judge concluded this time was necessary for TIG to thoroughly investigate "if it <u>had</u> in fact been previously notified" and if not, "<u>why</u> it hadn't previously been notified," app. 18a, there is ample evidence that Long and her colleagues failed to actively pursue answers to these questions for <u>months</u> at a time. <u>Cf. Structure Tone, Inc. v. Burgess Steel Prod. Corp.</u>, 672 N.Y.S.2d 33, 34 (App. Div. 1998) ("[D]isclaimer . . . [,] issued 38 days after plaintiff's own untimely notice, was not unreasonable in light of the unrefuted showing of a prompt, diligent, and good faith investigation of the claim...."); <u>Mount Vernon Fire Ins. Co. v. Harris</u>, 193 F.Supp.2d 674, 678 (E.D.N.Y. 2002) (finding a fifty-day delay reasonable in order for insurer to conduct a "prompt investigation" into the claim).

Moreover, Hammersmith has pointed to evidence that by July 2001, TIG was aware of sufficient facts to disclaim coverage, but failed to do so until October 2001. On November 1, 2000, Hayes Battle faxed Terri Long a copy of the first amended complaint in the underlying action between Hammersmith and CCC. App. 1795a. The next day, Long forwarded the complaint, along with the declaration pages of the renewal policy and a DKM company profile and loss history, to Jacobs. App. 1824a. Although Aon did not send a copy of the excess policy to Long until March 23, 2001, TIG certainly could have obtained a copy of its own policy from another source in the meantime. App. 1876a. On May 1, 2001, defense attorney P. Brennan Hart provided Long with all of the pleadings in the underlying action and the deposition of John FitzSimons. App.

63

1889a.

Two months later, on July 5, 2001, TIG received a controlled loss report from Gallagher Basset which indicated that the "D/R to Insd" for the Hammersmith claim was October 16, 1998. App. 1905a. Terri Long was a carbon copy recipient of this report. App. 1906a. Although TIG contends that it did not know when DKM was first notified of the Hammersmith claim until it received Leopold's September 18, 2001 letter, app. 1953a, the Gallagher Basset report suggests otherwise. Thus, Hammersmith has raised a genuine issue of fact as to whether TIG had adequate information to disclaim coverage several months before October 2001.[23]

---

[23] TIG relies heavily on the fact that DKM and Aon never provided TIG with an excuse for the allegedly late notice during the course of TIG's investigation. Hammersmith has raised an issue of fact as to whether TIG pursued this information with diligence, and whether this information was even necessary for TIG to disclaim coverage. In Jacobs' memorandum to Long discussing the late notice issue, he noted that "some New York federal decisions raise the issue as to whether TIG's notice provision would be construed to require notice of all claim[s] (as its language states) or only those reasonably likely to involve its policy." Memorandum from Stephen Jacobs to Terri Long, Oct. 2, 2001, App. 1987a. However, he concluded, "[g]iven the severity of the injuries alleged in the Hammersmith complaint, we do not consider the issue determinative." Id. at 1987a-1988a. Additionally, in TIG's response to Hammersmith's Statement of Undisputed Facts submitted to the District Court, TIG admitted that it "construes the notice conditions in its Policy to require

There is also evidence in the record that, between April and July 2001, TIG focused much of its attention on whether CCC qualified as an insured under the excess policy. Long first identified CCC's insured status as an issue on April 27, 2001. See TIG's Response to Hammersmith's Statement of Undisputed Facts, App. 101a, ¶ 180; Long Dep., App. 1069a-1070a. Long's notes indicate she was still researching the issue in June. See TIG's Response to Hammersmith's Statement of Undisputed Facts, App. 101a, ¶¶ 181-182; Long Dep., App. 976a. In mid-July, Fikes asked Long if she had "resolved whether or not [TIG] insure[s] CCC, Conveyors, Inc.?" E-mail from Kathleen Fikes to Terri Long, July 18, 2001, App. 1926a. The following day, Fikes forwarded Long her own analysis of the issue, and urged Long to consult Jacobs to the extent he had already "not studied the issue." E-mail from Kathleen Fikes to Terri Long, July 19, 2001, App. 1908a-1911a. Hammersmith argues, and we agree, that this evidence raises serious factual issues regarding TIG's diligence in conducting its investigation. Although by March 2001 TIG possessed the excess policy and related application materials reflecting the date DKM sold CCC, TIG took nearly three months to reach a position on whether CCC was insured under the policy. This unaccounted-for delay, along with the other issues of fact cited above, preclude a

that it be notified of every lawsuit against the policyholder, regardless of whether the claim appears insignificant or unlikely to impact its coverage." App. 92a, ¶ 26 (admitting Hammersmith's SOF ¶ 26, App. 53a). Thus, there is a genuine issue of fact as to whether TIG would have accepted any excuse for late notice from DKM or Aon, under its view of New York law and the facts of the case.

65

finding that the eleven-month time period between TIG's notice and disclaimer was reasonable as a matter of law.[24]

_____

[24]In concluding that TIG's delay was reasonable as a matter of law, the District Court distinguished Hammersmith's case from several New York Court of Appeals decisions, including Hartford Ins. Co. v. County of Nassau, 389 N.E.2d 1061 (N.Y. 1979), and Firemen's Fund Ins. Co. of Newark v. Hopkins, 666 N.E.2d 1354 (N.Y. 1996). In Hartford, the court held that an unexplained delay of two months was unreasonable as a matter of law. The District Court thought this was quite different from Hammersmith's case, because TIG "offer[ed] a legitimate explanation for its delay in denying coverage – it was searching for information that would, as definitively as possible, establish that it had received late notification of Mr. Hammersmith's accident." App. 16a-17a. We agree with the District Court that, unlike Hartford, TIG has offered an explanation for its delay. However, as we discussed above, we think there are important issues of fact regarding the reasonableness of TIG's eleven-month investigation.

In Firemen's Fund, the court found the insurer's delay was unreasonable as a matter of law because it disclaimed coverage eight months after receiving notice of the claim, and four months after receiving the complete record of the underlying accident. 666 N.E.2d at 1355. The District Court found this case "readily distinguishable" because "notification of the claims [in Firemen's Fund] was very straightforward," whereas Hammersmith's case involved a more complicated investigation of the late notice issue. App. 17a-18a. We agree that cases involving third party brokers and notice to excess carriers are necessarily complicated, and may require longer

66

## VI. <u>Conclusion</u>

Although we have concluded that the District Court used the wrong standard to determine the applicable state law, its decision to use New York law was correct on the facts of record. However, we vacate the grant of summary judgment to TIG on the issues of late notice and disclaimer, and remand for further proceedings.

---

investigations before insurers can reach coverage decisions. However, this does not alter our conclusion that Hammersmith has raised a material issue of fact that TIG failed to conduct its investigation in a reasonable, diligent and prompt manner. In <u>Hartford</u>, the court emphasized that "[i]t is only in the exceptional case that [the late disclaimer issue] may be decided as a matter of law." 389 N.E.2d 1061. This is not such a case.